Filed 1/21/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S178272 |
| v. | ) | |
| | ) | |
| BILLY JOE JOHNSON, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 07CF2849 |
| _____ | ) | |

A jury convicted defendant Billy Joe Johnson of the first degree murder of Scott Miller (Pen. Code, § 187, subd. (a)),[1] and found true the special circumstance allegations that the murder was committed by means of lying in wait (§ 190.2, subd. (a)(15)), and for the benefit of, or at the direction of, and in association with a criminal street gang (§ 190.2, subd. (a)(22)). The jury also convicted defendant of conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a)), and as an accessory after the fact (§ 32), and found true a criminal street gang enhancement allegation as to all three counts. In connection with the murder and conspiracy counts, the jury further found true the allegation that a principal discharged a firearm. After the jury rendered its guilt phase verdicts, the court conducted a court trial on the special circumstance allegation that defendant

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

**SEE CONCURRING OPINION**

previously had been convicted of murder (§ 190.2, subd. (a)(2)), and found that allegation true. At the conclusion of the penalty phase trial, the jury returned a verdict of death. The court denied an automatic motion for modification of the death verdict to life without the possibility of parole (§ 190.4, subd. (e)), and sentenced defendant to death.**2** Defendant's appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

##### a. Events prior to the murder of Scott Miller

Scott "Scottish" Miller was a founding member of an Orange County based White supremacist street gang called Public Enemy Number 1 (PEN1), which formed in the mid 1980s. By the mid to late 1990s, Miller's status within the gang had diminished, and he had become marginalized.

In February 2001, a local television station aired two news segments about PEN1. The segments featured an interview with Miller, who spoke candidly about the gang's activities, including its use of violence. Although news producers attempted to protect Miller's identity by disguising his face and voice, PEN1 gang members immediately recognized Miller by his tattoos, mannerisms, and the objects around him, including his pit bull.

---

**2** Before ruling on the automatic motion to modify the verdict, the court granted the prosecution's motion under section 1385 to dismiss various prior conviction allegations that previously had been bifurcated from the guilt phase of trial but not resolved. The court later stayed, pursuant to section 654, sentence on the conspiracy and accessory convictions.

The news segments were considered bad timing for PEN1, whose two main leaders were then being tried on charges of conspiracy to commit murder. As a result of the broadcasts, PEN1 leadership put a "green light" on Miller, marking him for execution. On several occasions during the year that followed, Miller told his girlfriend that he was concerned for his safety. According to one former gang member, however, Miller was still "running around" because no one had the courage to deal with him. Shortly before March 2002, officers in the gang unit at the Costa Mesa Police Department were actively looking for Miller to warn him that they had received credible information that PEN1 members were planning to kill him.

### b. The murder of Scott Miller

On the evening of March 8, 2002, a little over one year after the news segments about PEN1, defendant's cousin hosted a party in Costa Mesa. Several members and associates of PEN1 attended the party, including Miller and defendant, who had recently transitioned to PEN1 after a falling out with the Nazi Low Riders, a White supremacist prison gang. Although defendant had known Miller for decades, he had not seen Miller since the news broadcasts had aired. According to the testimony of a mutual friend who also attended the party, Miller and defendant were laughing together and joked about Miller keeping "his guard up."

Around 10:30 p.m. on the night of the party, Miller's now ex-girlfriend received a voicemail message from him. He sounded concerned. In the background she heard voices, one of which she recognized as defendant's. Another woman who previously had dated Miller saw him when she first arrived at the party at 10:00 p.m. But she left the party shortly thereafter to buy drugs and by the time she returned around 11:00 p.m., Miller was no longer there.

3

Earlier that day, PEN1 member Michael Lamb had called Christina Hughes at her Anaheim apartment. He was looking for Tanya Hinton, a PEN1 associate who was staying there. Hughes told Lamb that Hinton was not at the apartment. He responded, "It is important, have her call me when she gets home." Hughes gave Hinton the message when Hinton arrived at the apartment in the early evening, but told Hinton that she did not want any visitors coming to her place. Shortly before 11:30 p.m., however, Hughes walked downstairs from the upper level of the two-story apartment and saw Hinton with Lamb and PEN1 member Jacob Rump on the first floor. Both men had recently been released from prison. When Hughes demanded that they go, Hinton assured her the group was leaving, and Hughes went back upstairs. Minutes later, Hughes heard a single shot fired outside in the alley. A neighbor whose home faced the alley also heard a gunshot, followed by the sound of screeching tires. Sometime between 11:30 and 11:35 p.m., Hughes and a friend went to the alley to investigate. She saw the dead body of a man she did not recognize and a large amount of blood.

Police responded to the scene about 20 to 25 minutes after the shooting, and found Miller's body facedown in the alley with blood coming from the head area. There was a bloody baseball cap and soda can underneath Miller's head, which suggested he had been surprised by the gunshot and dropped the items where he was shot. In the blood, police found tire impressions that were heading away from the location of the body. They also recovered a nine-millimeter Luger casing on the ground 15 feet from the body.

An autopsy showed Miller had died from a single gunshot to the back of his head, which lacerated his cerebellum and cerebrum. According to the forensic pathologist, Miller probably lost consciousness immediately and death occurred within minutes. The absence of burning, singeing, stippling, or soot at the

4

entrance wound suggested the barrel of the gun was some distance from the skin, not in contact with it.

The day after the shooting, defendant called Miller's former girlfriend, asking her if she had heard what happened. He told her that "Scott is no longer with us" and something to the effect that if she needed anything, he would be there for her.

That same day, defendant spoke with his friend and fellow gang member Donald McLachlan about his involvement in Miller's death. Defendant told McLachlan that he drove with Miller from the party in Costa Mesa to Anaheim, telling Miller they were going to get drugs. Defendant also indicated that he was walking next to Miller in the alley before he was killed. When Miller heard footsteps coming from behind, he asked defendant, "Are those PEN1 guys?" He was then introduced to Lamb and Rump. According to defendant, Miller seemed resigned to the idea that something was going to happen to him.

Defendant identified Lamb as the shooter. He also told McLachlan that he was angry and upset about the way the killing was handled and had confronted Lamb about it. Describing Miller as a "dear friend," defendant thought Miller should have been executed by a shot to the face, not to the back of the head. As defendant envisioned the scenario, Miller should have been told to his face, "You had a good run, you ran afoul of the rules, it is time to go." Defendant explained that Miller had to be killed because of the news interview and "his actions . . . in the neighborhood."

c. *The investigation*

Three days after the shooting, Lamb and Rump were taken into custody after leading police on a high-speed chase in a stolen car and fleeing into an Anaheim apartment complex. Just before his arrest, Lamb fired a shot at officers

5

from a second-story balcony, then discarded his weapon by tossing it over the railing into a raised planter. A firearms expert concluded that the cartridge found at the scene of Miller's death had been fired from the gun Lamb fired at officers. The gun had a capacity for 14 bullets in the magazine and one in the chamber. Lamb and Rump were charged with murdering Miller, and were jointly tried in 2007.

When a detective had tried to interview defendant in October 2002 regarding Miller's death seven months earlier, defendant said he had nothing to say to him. In 2006, however, defendant contacted Lamb's investigator about the crime, telling the investigator that *he* was the person who shot Miller, and agreeing to testify at Lamb and Rump's trial that they had nothing to do with the shooting. At the time he contacted Lamb's investigator, defendant had just begun serving a prison sentence of 45 years to life in an unrelated case.

Defendant testified on Lamb's behalf at both the guilt and penalty phases of trial. According to defendant, the first time he saw Miller after the news segment about PEN1 was at the party in Costa Mesa, but he had been angry with Miller about the interview and other matters for some time. Between 8:00 and 10:00 p.m., he and Miller left the party in Costa Mesa to buy heroin. During the drive, defendant knew Miller would "cease to exist" before the night was over. After stopping briefly at a strip mall so that Miller could use the telephone, they continued driving into Anaheim, ending up in an alley near an apartment complex. Defendant parked his truck and they started walking down the alley. At one point, Miller and defendant started to turn left into an opening that led to a walkway to the apartments, with Miller walking a couple of paces ahead of defendant. Moments later, defendant grabbed a gun from his waistband and "blasted him." Defendant ran back to his truck, which was located about 60 feet from Miller's

6

body. He testified that he saw no other cars in the alley as he was leaving, and that he drove off at a normal speed and returned to the party.

Defendant also testified regarding the firearm that was used to kill Miller. According to defendant, he ran into Lamb in a bar the day after the shooting and gave him the weapon, which Lamb said he needed to protect himself against Mexican gang members. Defendant indicated that the weapon had been in his possession for about six months. However, during cross-examination he said he did not know the location of the gun's safety, and his answer regarding the number of bullets the firearm could hold was incorrect.

After testifying at the guilt phase of Lamb and Rump's trial in 2007, but before taking the witness stand at Lamb's penalty phase trial in 2008, defendant was charged with Miller's murder, for which the prosecution was seeking the death penalty. Despite the court's repeated admonitions regarding his right against self-incrimination, defendant continued to maintain that he shot Miller. He told Lamb's penalty phase jury that he lives by his own laws and that he would kill "anyone like [Miller] that doesn't abide by the rules." Defendant testified more specifically that after seeing Miller's interview on the news broadcast, he knew Miller was a "dead man" because he was giving up secrets "to the enemy" and divulging information that was detrimental to PEN1.

### d. Other evidence at defendant's 2009 trial

The prosecutor, joined by the lead detective in the Miller shooting, read aloud to the jury a redacted version of the transcript of defendant's prior testimony. The prosecution also called several gang expert witnesses who testified regarding defendant's past and present gang affiliations, and the history, culture, and activities of White supremacist gangs generally and PEN1 in particular.

7

Eric Kraus, an Orange County parole officer who specializes in supervising White supremacist parolees, was defendant's parole officer for about three years, beginning in early 2001. During that time, defendant was a documented associate of the Nazi Low Riders.

In May 2001, Kraus arrested defendant for a parole violation and he was returned to custody. About one week later, Kraus and Costa Mesa police Lieutenant Clay Epperson visited defendant in prison at defendant's request. Defendant informed Kraus that another prisoner had cut him with a razor on the back of the neck while they were in the exercise yard. Defendant explained that he had been assaulted for previously refusing to follow a "green light order" to kill his friend and prison cellmate Joseph Govey, but that the recent assault meant he would receive no further discipline for his disobedience. According to Kraus, such an order would have come from a "shot caller" in either the Aryan Brotherhood or the Nazi Low Riders prison gang.

During Kraus's prison visit, defendant indicated to him that his current gang status was with PEN1, "if anything." Kraus believed that defendant's self-report was confirmed by correspondence intercepted by prison officials, in which defendant identified himself as a member of PEN1.

Like Kraus, Lieutenant Epperson expressed the view that defendant was a member of PEN1 at the time of Miller's death. In forming that opinion, Epperson pointed to defendant's statements during their May 2001 prison visit, his testimony at the Lamb and Rump trial, his prior conviction for dissuading a witness for the benefit of a criminal street gang, recorded telephone calls in which defendant issued orders on behalf of PEN1, and his many PEN1 and White supremacist-themed tattoos.

Epperson also provided extensive testimony regarding the history, structure, and culture of White supremacist gangs. He indicated that despite the

8

fact they sport tattoos of Nazi symbols to represent themselves, and are bound together by racial animus, anti-Semitism, and other forms of hatred, White supremacists are not ideologically driven. They tend to prey on their own community with crimes that benefit themselves and the gang, rather than commit hate crimes. The gangs are structured hierarchically, and status within the gang is earned by the amount of crime and violence the member has carried out to benefit the gang. Criminal successes are therefore boasted about and known to other gang members. Respect is an important theme in White supremacist gang culture, and disrespect from gang members and nonmembers alike is met with violence. An act that is viewed as disrespectful of the gang leadership would require even greater sanctions, including being marked for death. The "payback" for disrespecting gang leaders can occur immediately or days, months, even years, later.

Focusing more specifically on PEN1, Epperson described the gang's history and activities. Formed in 1986 by followers of a punk rock band, PEN1 soon transitioned into a street and prison gang and grew rapidly to fill a power vacuum when the prominence of the Nazi Low Riders began to decline. According to Epperson, PEN1's "stock in trade" is "self-serving thuggery and violence" and the gang often targets law enforcement, prison officials, and prosecutors. The gang's moneymaking activities include identity theft and drug trafficking, which it carries out with the help of female associates.

### 2. Defense evidence

The defense called no witnesses or otherwise presented any evidence at the guilt phase.

9

**B.  Penalty Phase Evidence**

*1. Prosecution evidence*

The prosecution's case in aggravation included evidence regarding defendant's violent criminal activity both in and out of custody, defendant's prior criminal convictions and prison rules violations, recordings of defendant's telephone conversations with PEN1 gang members and associates while he was in custody in the Orange County jail, and victim impact testimony.

*a. Violent criminal activity and prior convictions*

*i. Robberies of Virgil Troutman and Catherine Brandolino*

Four witnesses testified regarding defendant's involvement in the April 1985 residential robbery of Virgil Troutman.  According to Troutman, defendant and two other men burst into his Costa Mesa home demanding money and drugs and assaulting him and his friend.  Troutman recognized the three intruders because they all had grown up together.  After being punched in the eye by one of defendant's confederates, Troutman and his friend were directed to empty their pockets.  Defendant and the two other robbers took various valuables, including a diamond ring, then left the scene, threatening to kill Troutman and his friend if they called the police.  Defendant's parole officer testified that defendant telephoned him two days after the robbery, admitting that he had hit Troutman during the incident.  On the parole officer's advice, defendant turned himself in to police.  According to the arresting officer, defendant indicated that he was angry with Troutman for selling cocaine to a young boy.  Although Troutman testified that he had previously used cocaine, he denied ever having sold cocaine to anyone, including a child.

In connection with this incident, the prosecution presented evidence that defendant pleaded guilty to grand theft from a person.  The prosecution also presented evidence showing that, about two years earlier, a jury found defendant

10

guilty of second degree burglary for breaking into and entering a Santa Ana residence with an intent to steal.

Three other witnesses testified regarding defendant's involvement in a robbery that occurred in April 1989, two years after the Troutman robbery. Catherine Schreiner, formerly Catherine Brandolino, told the jury that the incident occurred early in the morning as she and a girlfriend were returning to their car in the parking lot of a Denny's restaurant. A man approached her girlfriend, then her, asking what time it was. After a pickup truck arrived and stopped about 10 feet away with its motor idling and passenger door open, the man suddenly grabbed Brandolino's purse off her shoulder, jumped into the truck, and shut the door. Brandolino and her friend yelled at the men and held on to the truck, trying to open the door, but they jumped back when the truck took off. Brandolino's friend, Linda Nguyen, gave a similar account of the incident.

Officer Michael Cacho of the Costa Mesa Police Department testified regarding the events that followed the 911 call reporting the purse-snatching incident. According to Officer Cacho, Brandolino and Nguyen provided him with descriptions of the robbers, and the license plate number and description of the truck, which was then broadcast to other officers. One of the officers who heard the broadcast located the truck, stopped the vehicle, and detained defendant, who was driving, and his passenger. Brandolino and Nguyen both identified the truck. At an in-field lineup, Nguyen indicated that she had not seen the driver's face but believed the checkered shirt defendant was wearing matched the shirt worn by the driver.

The prosecution presented evidence that in connection with this incident defendant pleaded guilty to second degree robbery.

11

### ii. The 1991 killing of Folsom State Prison inmate Clyde Nordeen

The prosecution presented extensive evidence regarding defendant's involvement in the April 1991 killing of 56-year-old Clyde Nordeen, who was serving a sentence in Folsom State Prison for child molestation. Correctional Officer Marshall Stewart testified that on the day of the incident, he was on duty supervising defendant and about 25 to 30 other inmates who were assigned to a wood-cutting job in a Folsom prison work area known as China Hill. As Officer Stewart explained, inmates assigned to China Hill are dressed in long-sleeved blue shirts, usually with a white T-shirt underneath, and they are permitted to use tools such as pickaxes and shovels. Officer Stewart testified that while conducting a perimeter security check around 11:30 a.m. on the day in question, he noticed blood along the back side of China Hill's fence line. Following the trail of blood he discovered Nordeen's badly beaten body in the back corner of a storage shed. Forensic Pathologist Gregory Reiber testified that Nordeen had suffered severe brain injury and extensive blunt force trauma to his head and face, including numerous lacerations and multiple fractures on his skull and eye sockets. He found no defensive wounds on Nordeen's extremities and believed that his death was not instantaneous.

Other witnesses testified regarding the investigation into Nordeen's killing. For example, a correctional officer documenting the scene at China Hill told the jury that a short distance from Nordeen's body he found a concrete-filled metal pipe and a wooden pickax handle, both of which had blood on them. He also discovered other evidence nearby that appeared to be related to the crime, including another wooden pickax handle and a wooden handle possibly from a shovel.

12

Evidence of defendant's involvement in Nordeen's death was presented largely through the testimony of Sergeant Steven Vance, who led the prison's investigation into the incident. Vance related to the jury the information given to him by Ronald Rostamo, one of the inmates assigned to the wood-cutting job on China Hill on the day in question. According to Vance, Rostamo told him that around 11:00 a.m., he overheard inmate John Alder say to defendant, "He's not dead yet." He then saw Alder pick up a wooden pickax handle and heard him tell defendant there was another one on the ground "that would work." Rostamo watched as defendant and Alder walked down a pathway toward the rear of the storage shed and disappeared from his view as they passed a small trailer. According to Rostamo, defendant and Alder reappeared two to three minutes later walking together back along the path and checking each other for bloodstains. Rostamo further reported that when defendant and Alder returned to the worksite, defendant said to Rostamo, "Give me your T-shirt, mine has blood on it." Fearful of defendant, Rostamo went to the shed with defendant where defendant put on Rostamo's white T-shirt and returned to his work at the wood pile. Rostamo told Vance finally that defendant and Alder hid their T-shirts underneath a small trailer near the shed. An investigator dispatched to that location found the hidden shirts. Rostamo's account of the T-shirt exchange was further supported by the testimony of the correctional officer who conducted body searches of the inmates who returned from China Hill that day. He observed during his search that defendant and two other inmates were not wearing their long-sleeved blue shirts.

Nordeen's killing was referred to the Sacramento County District Attorney but no charges were filed. Prison authorities, however, found defendant guilty of a prison rules violation and transferred him to the administrative segregation unit for 26 months.

### iii. Recklessly evading a peace officer in 1994

Tom Dare, an officer with the Garden Grove Police Department, testified regarding an incident in October 1994 involving a driver who led him on a high-speed pursuit in a residential area and eluded arrest by escaping into the backyard of a neighborhood home. Officer Dare related that he was patrolling an area where a number of residential burglaries had recently occurred when he observed a driver make a quick and erratic turn into a driveway but then remain in the car. A check of the vehicle's license plate showed the car had recently been impounded and released. As the officer made a U-turn to investigate further, the car exited the driveway and Dare followed. When the car ran a stop sign and Dare activated his overhead lights to conduct a traffic stop, the car accelerated to upward of 70 miles per hour, running stop signs and skidding erratically near children playing in a front yard. The driver then pulled into a driveway, slammed on the brakes, fled the car, and jumped into the backyard. Officers searched some of the backyards in the vicinity but eventually called off the search because the residents in the area tended to be uncooperative with law enforcement and it appeared the driver had escaped into one of the homes. When Dare searched the abandoned vehicle, he found on the front seat defendant's driver's license and a letter addressed to defendant from the Department of Corrections and Rehabilitation. Dare believed the driver was the same person depicted in the photograph on defendant's driver's license.

### iv. The 2004 murder of Cory Lamons

During the guilt phase of trial, the jury learned that at the time defendant testified at Lamb and Rump's 2007 trial claiming that he was the one who killed Scott Miller, he recently had begun serving a sentence of 45 years to life. During the penalty phase, the jury was told that that prison term was a third-strike sentence imposed after defendant pleaded guilty to second degree murder for the

14

April 2004 killing of Cory Lamons and that, in a bifurcated proceeding following its guilt phase verdicts, the court found true a third special circumstance allegation, that defendant was convicted previously of murder, within the meaning of section 190.2, subdivision (a)(2). The prosecution also presented to the jury the following evidence regarding the details of the Lamons murder.

Sara Lenard rented a room in the two-story Huntington Beach apartment where the murder occurred. She testified that around 4:00 p.m. on the day Lamons was killed, she walked downstairs from her second-floor bedroom to find four people on the first level of the apartment whom she had never seen before. Defendant was holding a hammer in his hand and standing with his back against the wall near the door leading to an attached garage. When Lenard asked what was going on, the woman in the group, later identified as defendant's girlfriend Suzanne Miller, replied, "This isn't going to be good." When Lamons then walked into the apartment through the door leading from the garage, Lenard saw defendant strike Lamons with the hammer. According to Lenard, as defendant repeatedly hit Lamons in the head with the hammer, Lamons was screaming, "I didn't do anything, I didn't do anything." Terrified, Lenard ran out the front door. She returned a couple of minutes later after the screaming had stopped. When she came back inside, she saw a lot of blood and Lamons lying motionless on the floor. Lenard left the apartment again, this time with her boyfriend, who had been in the bedroom upstairs during the incident. The couple returned to the apartment several hours later to retrieve their possessions. When they entered, defendant and Suzanne Miller were gone and the blood had been cleaned up, but there were two men Lenard did not recognize, who warned her and her boyfriend to "[k]eep your mouth shut or something like this will happen to you."

Detective Steven Mack testified regarding the circumstances surrounding the discovery of Lamons's body and defendant's arrest two days after the killing.

Mack told the jury he was conducting surveillance on a white Ford pickup truck based on information he had received that a group of individuals was trying to dispose of a body. At the time the truck was eventually pulled over in Riverside, defendant was at the wheel and Suzanne Miller was in the passenger seat. In the bed of the truck was a wood pile covered with carpeting. When Mack detected the odor of decomposing flesh and investigated further, he discovered Lamons's body underneath the wood. It had been wrapped in dark material that was held together with strips of bedsheet.

Detective Mack testified further regarding the condition of Lamons's body at the time it was discovered in the back of the truck. According to Mack, Lamons's left eye and lips were swollen, and he had visible bruising on the forehead, knuckles and upper legs. The parties stipulated that the Orange County Coroner's Division could not determine the precise cause of death due to the high level of drugs in Lamons's body. The cause of death was therefore listed as "blunt force head injuries with methamphetamine and amphetamine intoxication."

Mack also described the evidence obtained during a search of the Huntington Beach apartment where Lamons was killed. He told the jury that officers found bleach stains on the carpet leading to the door to the garage, and a claw hammer, the striking portion of which was consistent with the bruise marks on Lamons's body. In the garage, officers found the remnants of a bedsheet that matched the material used to tie the material covering Lamons's body.

Lamons's mother testified briefly, telling the jury that she misses her son every day, and that the worst part for her is knowing that he died a violent death but she was not there to protect him.

The prosecutor and the lead detective in the Miller killing then read aloud to the jury the transcript of defendant's testimony at the Lamb and Rump trial in which he discussed the Lamons murder. That portion of the prior testimony had

16

been redacted during its presentation in the guilt phase of defendant's trial for the Miller killing. The jury thus heard defendant admit that he beat Lamons to death with his hands and a hammer and then wrapped up his body. When asked why he killed Lamons, defendant replied that Lamons "had it coming." Specifically, defendant said it was "gang-type stuff," that Lamons was "ripping off girls," and "being a dope fiend . . . stealing things, taking things, whatever."

### v. Violent conduct while in custody

The prosecution presented evidence of numerous incidents involving defendant's use of force and violence while in custody.

Correctional Officer Mireles testified that in June 1991, she saw defendant attack his cellmate at Folsom State Prison. Defendant stood over the inmate punching him with closed fists until Mireles could separate them by removing the inmate from the cell and closing the door.

Correctional Officer Gomez testified that about one year later, in May 1992, he heard defendant shouting from his cell in the security housing unit at California Corcoran State Prison (Corcoran). When Gomez went to investigate, he observed defendant's cellmate seated on his own bunk, with bloodstains on his shirt. Defendant admitted hitting his cellmate, claiming that he did so after his cellmate said he would "beat my ass" and "took a swing at me."

A different officer testified about another incident at Corcoran several months later in July 1992. Correctional Officer Schuman was in a tower with a view of the exercise yard when he observed defendant attack another inmate by hitting him on the head and shoulders with clenched fists. The inmate fell backward but defendant continued to hit him in the head, ignoring Schuman's order to stop fighting. Defendant eventually complied with the order and lay prone on the ground after Schuman fired a round from a .37-millimeter gas gun in

17

his direction.  But when defendant and the other inmate resumed fighting, Schuman had to discharge the gas gun a second time to bring the situation under control.

Defendant had been released from custody at one point but was returned to prison for a parole violation in early 1995.  Correctional Officer Wren testified that in May 1995, he responded to a "man down" report in a housing area for gang members in the California Institute for Men, Chino (Chino).  Wren told the jury that he observed defendant's cellmate lying on the cell floor bleeding profusely from deep cuts in his right shoulder, hand, forearm, chest and thigh.  After removing the injured cellmate for medical treatment, Wren returned to the cell and observed that defendant had a laceration on his right hand.  According to the officer, such injuries were consistent with the use of a razor blade.  The prosecution presented evidence that defendant pleaded guilty to assault by a state prisoner and received a second-strike sentence of four years to run consecutively to his then-current sentence.

Correctional Officer Hinojos testified that four months later, in September 1995, he responded to defendant's cell at Chino after another "man down" report.  According to Officer Hinojos, he observed that defendant's cellmate had a head injury and defendant had minor abrasions and bleeding on several fingers.

In May 1996 defendant was back at Corcoran in the administrative segregation unit.  Correctional Officer Smith testified that when he searched the cell occupied by defendant and his cellmate, he found on the cellmate's side of the room two pieces of weapon-grade metal and, on defendant's side, a handmade handcuff key.

Correctional Officer Priest testified about an incident at the same prison six months later, in November 1996.  Officer Priest told the jury that he heard a commotion coming from the cell defendant shared with another inmate and

18

observed defendant standing over his cellmate punching and kicking him in the head and upper torso while the cellmate was on the floor in a fetal position trying to protect himself. Priest ordered defendant to stop and exit the cell, but defendant continued punching and kicking his cellmate until Priest fired a nonlethal rubber baton round at him.

Culinary Officer Nava described for the jury defendant's conduct during the Chino staff's investigation into a homicide that had occurred at that facility in June 2003. As part of the investigation, inmates were being transported from their cells to the prison kitchen to be interviewed. Nava told the jury that he observed defendant shout out an order to fellow White inmates not to go to the kitchen for interviews.[3] Nava alerted staff to defendant's announcement and accompanied another officer to defendant's cell to investigate. Defendant told them that no White inmates would be going to the kitchen. Afterward, no White inmate gave an interview.

### vi. Orchestrating crimes while in custody

The prosecution played a number of tape recordings and presented transcripts of defendant's monitored telephone calls while in custody in the Orange County jail from 2007 until a few weeks before trial in his case in 2009. The recordings were played at various points during testimony by Sheriff's Deputy Seth Tunstall, who had monitored and recorded the conversations.

---

[3] According to Nava, defendant yelled, "Radio, radio, all wood pile, all wood pile and comrades. The sergeants are conducting — are taking interviews in the kitchen so you will not, I repeat, you will not go into the kitchen. And I mean no one. And I mean no one. Thank you," to which other inmates responded, "Thank you." Nava explained to the jury that "wood pile" is a reference to White inmates and "comrades" refers to those who are active members of defendant's "set group."

19

Tunstall identified for the jury the participants in the telephone calls and their relationship to the PEN1 gang, and he described the individuals and organizations referenced in the calls.

In some of the calls, defendant seemed to be coordinating in-custody assaults on members of a rival White supremacist gang called the United Society of Aryan Skinheads (USAS). For example, in April 2007 defendant spoke with Rebecca Mangan, who was Lamb's girlfriend at the time and an important conduit for defendant's communications outside the jail. In that call, Mangan told defendant that a PEN1 gang member named "Stomper" had been stabbed by someone from USAS while in state prison. Defendant told Mangan that if she talked with PEN1 member "Half P" she should tell him what had happened to Stomper. He also directed Mangan to "[t]ell him I said go get one now." Defendant's remarks during the recorded conversation indicated that Half P was in custody in the same prison where defendant had been housed before his transfer to county jail, and that there were "four of them," meaning four USAS members that he and Half P had been "checking on."

About one year later, in a March 2008 conversation with his friend Andrea Metzger, defendant asked her whether she had sent a letter regarding USAS to another PEN1 state prison inmate, "Patrick," and instructed her to tell him "to be on the lookout for them" because they have "jumped . . . three homies in the last year." Defendant told her to have Patrick tell "anybody and everybody that has anything to do with . . . our people . . . ." Defendant added, "Fuck them dudes, . . . smash them all until they fucking go blind." Defendant then told Metzger he needed "it to go . . . [e]verywhere, all worldwide . . . [that] if you run into one of them fuckers, just smash them, period, no if, ands, or buts about it."

Other telephone calls suggested that defendant was setting up crimes to be committed outside prison facilities. For example, in a series of conversations in

20

late May and early June 2007, defendant spoke with PEN1 gang members Jason Cary and Jason Jones and to Jill Walker, another woman who helped facilitate his communications outside the jail, regarding what appeared to be a plan for a home invasion robbery. Defendant told Walker to "grab his scooter" and "anything else that ain't nailed down," and to "take him down" and "divvy it up when they're done." When Walker informed defendant that "the Mexican dudes were gonna take care of it," defendant asked, "You didn't tell 'em where it was at or anything did ya?" She assured him she had not. Defendant then instructed Walker to "call the homeboy back right now" so defendant could "set up the fucking guidelines." He also directed Cary to get in touch with "the homeboy" on a "secure line," telling him that he "want[ed] to make this thing happen." In a conversation with Jones, defendant instructed him that "everything goes," including a $30,000 "scooter." In a third and final conversation about the apparent plan, defendant told Cary that defendant's brother wants him "there" on Monday. He also expressed frustration, saying he did not "know why . . . this is so difficult for everybody to understand." When Cary said it was "just a matter of getting together," defendant provided him with the names of others who "should be ready." Defendant then commented that "evidently somebody needed to hear my voice to . . . tell 'em . . . [to] put the pieces of the puzzle together and fucking make it happen."

In one of the recorded conversations described above, defendant indicated that he already had a cash buyer for the "scooter" and agreed with Walker that he would split the proceeds from the sale with her. The prosecution also played for the jury a monitored call between defendant and his two brothers in which defendant apparently again sought to profit by putting PEN1 gang members "to work." In that July 2007 conversation, defendant said he needed to find "some jobs." He also said that "the dudes will go do it . . . [and] . . . [t]hey tell me they'll

21

give me a third, right off the top." Defendant also said he planned to "throw [the money] into mom's bank account" so that he could access it.

To bolster the monitored calls evidence, the prosecutor read into the record the portions of defendant's testimony at Lamb and Rump's earlier trial in which he indicated that he still had contact with others outside of jail and that Mangan set up his communications with other people. Defendant also admitted in his prior testimony that he "possibly" attempted to set up home invasion robberies while in jail and "probably" ordered "a hit" on people. The subject of ordering hits arose again, during defendant's testimony on his own behalf in the defense case in mitigation, when the prosecutor elicited from defendant that he had "probably" tried more than five times in the past week to arrange for assaults on USAS members. As defendant explained, he was "on a mission."

### b. Victim impact testimony

As evidence in aggravation relating to the circumstances of the capital crime (§ 190.3, factor (a)), the prosecutor called Scott Miller's mother, Bonnie Miller, to testify about the impact her son's death had on her and other family members. According to Ms. Miller, after the murder, Miller's father suffered a fatal stroke, his older brother Calvin had to be hospitalized after a breakdown, and his elderly grandmother, with whom Miller was very close, nearly died from a heart condition. Ms. Miller testified further that she has fulltime custody of Miller's son, "Little Scott," who was born shortly after Miller's death. According to Ms. Miller, Little Scott does not comprehend why he does not have a father like his friends do, and it broke her heart to tell him he would never see his father. She told the jury it also breaks her heart to take Little Scott to the beach to watch the surfers because she realizes that Miller, who was an avid surfer, will never have a chance to teach his son to surf. Ms. Miller concluded her testimony by explaining

22

that part of her died when her son was murdered and, except for her love for Little Scott, she has since shut herself off from the rest of the world.

### 2. Defense evidence

The defense presented a multifaceted case in mitigation that included character witnesses, expert testimony regarding defendant's social history and psychological profile, and testimony by the former warden of San Quentin State Prison, who contrasted the day-to-day existence of a death row inmate with that of an inmate at a high security prison. Defendant also testified on his own behalf.

### a. Character evidence

Two witnesses who had testified during the prosecution's case-in-chief at the guilt phase of trial described for the jury a different side of defendant. Shirley Williams testified that she was good friends with defendant and his entire family, and that if she was in trouble in any way, defendant was there to help. According to Williams, defendant was always courteous to her and respectful and protective of women generally. She considered defendant a good father who loved his children, and she never saw him get violent or enraged; she experienced his gentler side only.

Another prosecution witness at the guilt phase, Donald McLachlan, told the jury he considers defendant "a friend in every definition of the word." He explained that if someone was having problems with a girlfriend or wife, or needed money, defendant would be there. McLachlan also recounted that on one occasion, defendant intervened to protect McLachlan's possessions when people started taking things from his residence after he had been taken into custody.

Suzanne Miller's testimony at the penalty phase reiterated the theme that there were two sides to defendant. Miller, who was defendant's girlfriend, acknowledged that defendant was capable of great violence. But she described

23

defendant as loving and respectful, and believed his life had value. Miller also characterized defendant as very protective, explaining to the jury that defendant agreed to a sentence of 45 years to life for Lamons's murder so that she and the other codefendants in the case could receive determinate sentences rather than life terms.

Joseph Govey testified about defendant's loyalty as a friend. He told the jury that when he and defendant were cellmates 20 years earlier, defendant showed Govey a letter indicating that an Aryan Brotherhood shot-caller had ordered defendant to kill him but defendant refused to do so.

### b. *Social history and psychological assessment*

The defense presented extensive expert testimony by Roberto Flores de Apodaca, Ph.D., a clinical psychologist. In forming his opinions, Dr. Flores conducted two interviews of defendant, administered psychological tests, and reviewed various records provided by the defense team.

Dr. Flores began his testimony by describing defendant's family background and social development, much of which was reported to him by defendant himself. Defendant's parents separated when he was 10 years old and he had had virtually no contact with his father since that time. His father's departure from the family was the point at which defendant started having behavioral problems in school and running afoul of the law. Defendant told Dr. Flores that he was grateful to his mother for working hard and providing for him and his four older brothers. But Dr. Flores was of the view that defendant's mother was overwhelmed and unable to adequately exercise any authority over defendant. Defendant reported positive relationships with his four siblings, with whom he spent the bulk of his time. Dr. Flores believed that defendant's older

24

brothers provided him with some parent-like care and guidance, but ultimately were not successful authority figures for him.

Notwithstanding defendant's description of an "idyllic" childhood and adolescence with his siblings, his criminal activities and substance abuse began at an early age. Starting with alcohol use at age 10, defendant had moved on to marijuana, LSD, and cocaine by the time he was 14 or 15 years old. By age 25, methamphetamine was defendant's "drug of choice." According to Dr. Flores, defendant's alcohol and drug abuse were both a cause and effect of his bad decisions that tended toward criminality, choices he was making on his own because he had no real authority figure in his life. For example, at age 10, defendant was arrested for receiving stolen property, specifically, some diamond earrings that he had sold to buy alcohol. Dr. Flores pointed out that defendant, who was 46 years old at the time of trial, had spent about 25 years of his adult life in prison, and he agreed with defense counsel that the prison environment provided defendant with structure and effectual authority figures.

Dr. Flores shared with the jury defendant's positive comments regarding his two former wives and his two children, 25-year-old Justin and eight-year-old Ryder. Defendant identified his drug use and lengthy incarcerations as the reasons for the marriage breakups, and he told Dr. Flores that he remained committed to his former wives and his children. Dr. Flores gleaned from these and other comments that although defendant can be violent and vengeful when, in his judgment, the situation called for it, he also can be loyal, committed, and helpful in other circumstances. In defendant's own words, "The two things that cannot be forgiven are [child molesters] and rats, everything else can be forgiven in life."

Dr. Flores also discussed the results of the intelligence and psychological tests he administered to defendant. He determined that defendant's intelligence quotient on a nonverbal intelligence test was 92, below the average score of 100 in

the general population, but possibly attributable to his having given up on school at such an early age. Defendant's responses on the personality assessment inventory showed that he was prone to drug abuse, aggression, and violence, and that he had no regard for the rights of others, social norms, or the law. That assessment further indicated that, with regard to defendant's propensity for aggression, he was irritable and short-tempered, and that he sometimes was unable to control his anger. In Dr. Flores's view, defendant's drug abuse was both the cause and effect of this impulsivity. Finally, Dr. Flores described the results of the Hare psychopathy checklist, a test that quantifies the subject's psychopathological tendencies associated with a "basic criminality makeup," which the tester then compares to the scores of inmates in the prison population generally. The checklist showed, among other traits, that defendant was cunning, manipulative, callous, and impulsive, and that he lacked guilt or remorse. Defendant's score, 34 out of 40, placed him in the 97th percentile of the prison population generally. In connection with this assessment, Dr. Flores referred to defendant as a "principle psychopath," meaning that his antisocial, criminal, and violent actions and behaviors are governed by his own internal ethical code, which derives from principles and values of his gang.

Regarding a diagnosis, Dr. Flores concluded that defendant met the criteria for antisocial personality disorder and that he was not amenable to treatment.

Defendant informed Dr. Flores during the interviews that he wanted to receive the death penalty. In Dr. Flores's view, defendant's stated reasons for preferring a death verdict — a more desirable quality of life on death row — was rational and not impulsive. Dr. Flores also believed that the other option for defendant, which likely would be spending the rest of his life in the security housing unit (SHU) at Pelican Bay State Prison, would not be compatible with his mental makeup.

26

*c. Differences between life in a security housing unit and life on death row*

Daniel Vasquez, the former warden at San Quentin State Prison, testified regarding the differences between the day-to-day life of an inmate placed in the SHU at Pelican Bay State Prison and that of a death row inmate at San Quentin. As Vasquez explained, the SHU at Pelican Bay is one of the most secure correctional facilities in the country, and prisoners who are documented street or prison gang members are sometimes placed there indefinitely. Inmates assigned to the SHU are locked in their cells almost 24 hours per day. They are allowed three cubic feet of property, including a television or radio. Although inmates in the SHU are allowed to exercise by themselves in a small indoor yard and to shower about three times a week, they have no outside visibility or fresh air and are not permitted face-to-face contact with visitors or other inmates.

Vasquez then described life on death row. According to Vasquez, condemned prisoners in death row's most desirable area, called the North Seg, can exercise right outside their cell door, and have more time out of their cells than inmates in the SHU. Good behavior is a requirement for assignment to North Seg and there is a long waiting list. Another area within death row, called East Block, is less attractive because the day-to-day existence is mostly repetitive and movement outside the cell is more restrictive. For example, inmates are searched and handcuffed when they are escorted to the outdoor exercise yard, which is densely populated with other death row inmates and guarded by armed officers. Death row inmates who exhibit bad or dangerous behavior are housed in the adjustment center, where the daily routine is similarly repetitive and restrictive. As Vasquez explained, death row inmates are allowed attorney and family visits and, with a record of good behavior, may be permitted face-to-face visits. Death

row inmates also are allowed up to six cubic feet of personal property, depending on their behavior grade.

In response to defense counsel's hypothetical question, Vasquez expressed his opinion that it was understandable for a convict with a documented history of prison gang affiliations to express a preference for living out his days on death row rather than in the SHU in Pelican Bay. As Vasquez pointed out, death row inmates have more protection from gang members and enemies and less pressure to align with gangs.

In response to defense counsel's line of questioning regarding misconduct by prison guards, Vasquez indicated he was aware of an inquiry by the Federal Bureau of Investigations into allegations that in the late 1980s and early 1990s guards at Corcoran staged fights between inmates and bet on them. According to Vasquez, the investigation resulted in indictments against some staff.

During cross-examination by the prosecutor, Vasquez answered questions regarding the records that chronicled defendant's 20-year history of incarceration in the state's prison system. He told the jury that the records showed numerous instances in which defendant was briefly released from prison but returned to custody for violating the conditions of his parole. The prosecutor also elicited from Vasquez information regarding defendant's numerous prison rules violations. Reading from prison records, Vasquez testified, for example, that during defendant's first prison commitment, he was written up five times for rules violations.

### d. Defendant's testimony

Defendant testified on his own behalf, telling the jury he would prefer being on death row at San Quentin than in the SHU at Pelican Bay. He also spoke about his social history, prison experiences, and gang affiliation, and offered his

own perspectives on Miller's murder and the evidence regarding his other crimes and acts of violence.

Defendant first commented on Miller's murder. He said that he felt "bad" for Miller's mother, but that Miller "messed up on laws written by us" and knew the consequences of his actions. When defense counsel asked defendant whether he had tried to assume more culpability for Miller's murder by saying he shot him when he had not, defendant replied, "Pretty much." Yet defendant still maintained that he was the shooter and that Lamb and Rump had nothing to do with killing Miller. During cross-examination, however, the prosecutor asked defendant to explain why he had to tell Lamb's girlfriend to remind Lamb, shortly before defendant testified at Lamb and Rump's trial in 2007, how defendant had gotten the murder weapon to him. In connection with that line of questioning, the prosecutor played for the jury a tape recording of a monitored call from the Orange County jail between defendant and Rebecca Mangan in which Mangan said "he," meaning Lamb, needed to know how defendant got "the bullshit to him." Defendant replied, "Oh, that, that was, at the fucking, uh, uh, Margaritaville," a detail that had been "fucking hatched a long time ago."

As he had done during his interviews with Dr. Flores, defendant described for the jury his upbringing, family relationships, and history of drug use. He recalled that as a boy he was involved in all types of sports but did not enjoy school because of the "authority figure" aspect of it. He characterized his father as a strict disciplinarian who would punish him harshly for showing disrespect, but spoke about his fondness for his mother and his two former wives, and his love for his own children. Defendant told the jury that he always had maintained good contact with his older son Justin, even during lengthy incarcerations. He acknowledged that his prison time and drug use had ruined his marriages, and reflected that had he never used drugs he probably would have lived a crime-free

29

life.  But defendant also admitted that he "still love[s] drugs" and "will do drugs" until he dies.

Defendant testified that he had grown up through the prison system, and he believed the decades he spent in that environment had produced his violent side. According to defendant, prison is a "kill or be killed" situation, and "everybody can get got, no matter how big you are, how small you are, the bodies hit the floor."  Defendant indicated that he himself almost had been killed when he was stabbed in the neck for disobeying a shot-caller's order to kill his cellmate Joseph Govey.

Defendant also testified regarding his involvement in White supremacist gangs.  He explained that he did not join a gang during his first incarceration because at that time he was "too young, too naïve to see that my race needed help."  He eventually aligned himself with a White supremacist gang because he wanted to help the older and younger inmates who were being preyed upon. Defendant indicated that he "lives" for his race, but has no problem with other races "unless they come into my area" selling drugs or burglarizing homes.  He does not want "people harassing my people" and would do "everything feasibly possible to make sure that they leave the neighborhood," including killing them, "if that's what it takes."  Defendant emphasized that he had never been convicted of a hate crime and had never beat up someone because of his race.

Defendant then offered the jury his explanations for some of the crimes and acts of violence that were described during the prosecution's case in aggravation. With regard to the killing of Folsom prison inmate Clyde Nordeen, defendant guessed that the reason no charges were filed against him was because Nordeen was a child molester.  Defendant did not like it that Nordeen got "a little two-year sentence" for raping children.  As for the various assaults on his Folsom prison cellmates, defendant explained that the prison had placed known informants in his

30

cell in an attempt to get him to talk about the fatal attack on Nordeen. Defendant also offered his reasons for assaulting fellow inmates in Corcoran. For example, he asserted that a September 1995 attack on an African-American inmate took place in a "gladiator arena." According to defendant, one of the guards asked if defendant minded him taking home the security camera recording of the exercise-yard fight, so that he could show his children the proper way to "beat somebody's ass." Defendant admitted that in November 1996 he assaulted an inmate who had dropped out of one of the gangs. As defendant put it, he "did what I had to do."

Defendant did not deny having engaged in numerous crimes and acts of violence both inside and outside the custodial setting, including two homicides that were not part of the prosecution's case in aggravation. He pointed out, however, that he always directed his violence toward drug dealers, addicts, gangsters, and convicts, and never against law enforcement. In defendant's words, "My actions have hurt people. I am sorry about that, but you know, the people that I hurt knew the job was tough when they took it. They signed onto the same thing that I signed onto." In this regard, defendant admitted the 1985 burglary of Virgil Troutman's home, which he described as a drug house. As defendant explained, Troutman was a drug dealer who refused to front defendant some drugs; defendant also had heard Troutman sold drugs to children, which bothered him. Defendant used a similar theme when discussing his involvement in Cory Lamons's murder, explaining that Lamons was a drug addict who owed defendant money and was stealing from women he knew.

Defendant minimized or flatly denied his involvement in other incidents presented in the prosecution's penalty phase case, however. Specifically, defendant indicated that he did not know that his "jackass" friend was going to steal a woman's purse in April 1989, and he claimed he was high on cocaine and alcohol when that crime occurred. Defendant also insisted that he had never run

31

from the police and was not the person who evaded Garden Grove officers in a high-speed chase in October 1994. He explained that he co-owned the car, which had been impounded, but maintained that "Alex" had retrieved the car and then run from police because he was carrying a pound of marijuana.

Defense counsel's direct examination of defendant ended as it had begun, by eliciting from defendant that his goal was to get the best situation for himself and he therefore preferred to live out the rest of his life on death row.

## II. DISCUSSION

### A. Guilt Phase Claims

#### 1. *Sufficiency of the evidence of lying in wait*

The prosecution presented alternative theories of defendant's first degree murder liability for Miller's death: (1) that the killing was premeditated and deliberated murder, or (2) that it was committed by means of lying in wait. (§ 189.) The jury found defendant guilty of first degree murder. The jury also found true the associated lying-in-wait special-circumstance allegation. (§ 190.2, subd. (a)(15).) Defendant asserts that his murder conviction based on lying in wait and the lying-in-wait special-circumstance finding were not supported by substantial evidence, and therefore cannot stand. Under the applicable standard for assessing his challenge to the sufficiency of the evidence (*People v. Booker* (2011) 51 Cal.4th 141, 172; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *Jackson v. Virginia* (1979) 443 U.S. 307, 319), we conclude to the contrary that a reasonable trier of fact could have found defendant guilty of first degree murder on a lying-in-wait theory, and the truth of the lying-in-wait special-circumstance allegation, beyond a reasonable doubt.

The capital murder in this case occurred in 2002, subsequent to a then-recent amendment to the statutory provision setting forth the lying-in-wait special

32

circumstance.  (§ 190.2, subd. (a)(15).)  Like the former version, the amended lying-in-wait special circumstance requires " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . ." [Citations.]' " (*People v. Moon* (2005) 37 Cal.4th 1, 22; see *People v. Poindexter* (2006) 144 Cal.App.4th 572, 584-585 [the definition of lying in wait appearing in *People v. Morales* (1989) 48 Cal.3d 527, 557, applies to the postamendment lying-in-wait special circumstance]; CALCRIM No. 728.)

The prosecutor's theory of the case at trial was that defendant was not the actual shooter but rather that he aided and abetted the murder by luring Miller out of Costa Mesa on the pretext of buying heroin and driving him to the location where Lamb and Rump were waiting to execute him in a surprise attack.  A lying-in-wait special circumstance can apply to a defendant who, intending that the victim would be killed, aids and abets an intentional murder committed by means of lying in wait.  (§ 190.2, subds. (a)(15), (c); *People v. Bonilla* (2007) 41 Cal.4th 313, 331-332 [relying on identical language in § 190.2, former subd. (b) as the statutory basis for an aider and abettor's liability].)  In this factual setting, the questions are whether the defendant, with the intent to kill, aided and abetted the victim's killing, and whether the actual killer intentionally killed the victim by means of lying in wait.  (*People v. Bonilla, supra*, at p. 331.)

Viewing the evidence in the light most favorable to the verdicts as we must (*People v. Johnson, supra*, 26 Cal.3d at p. 576), we conclude that all of the requirements for the lying-in-wait special circumstance were established in this case.  From defendant's statements to fellow gang member McLachlan the day after the shooting, the jury reasonably could infer that defendant harbored an intent to kill when he aided and abetted Miller's killing.  Defendant told

33

McLachlan that Miller had to be killed because of his news interview and his actions "in the neighborhood." Defendant had elaborated on the first point during his testimony at Lamb and Rump's trial, saying that he had been angry at Miller for some time for agreeing to be interviewed for the television news segment and that he would kill anyone like Miller who did not abide by the rules. Defendant also characterized Miller as a "dead man" for giving up the gang's secrets "to the enemy."

The record also contains ample evidence that defendant aided and abetted the killing. "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561; accord, *People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

It can be inferred from defendant's substantial participation in the events leading up to Miller's death that he knew of the plan to kill Miller, intended to facilitate that plan, and aided Lamb and Rump in committing the killing. Defendant was seen talking and laughing with Miller at the party in Costa Mesa a short time before the shooting. A day after the killing, defendant described for McLachlan his involvement in Miller's death. He told McLachlan that he drove with Miller from Costa Mesa to Anaheim with the pretense of obtaining drugs. He also said that he walked next to Miller in the alley right before Miller was killed. Defendant told McLachlan that after hearing the sound of footsteps behind them, Miller turned to defendant and asked, "Are those PEN1 guys?" and was "introduced" to Lamb and Rump. Defendant also recounted having yelled at Lamb for shooting Miller from behind, telling McLachlan he believed Miller should have been shot in the face so that they could have confronted him about

34

running afoul of the rules. From this evidence, the jury reasonably could infer that defendant aided and abetted Miller's killing.

The evidence further established that the actual killers intentionally killed Miller by means of lying in wait within the meaning of section 190.2, subdivision (a)(15). The record reflects that all of the elements of the special circumstance were satisfied. The autopsy showed that Miller was killed by a single shot to the back of the head, from which it could be inferred that he was killed intentionally. (See *People v. Burney* (2009) 47 Cal.4th 203, 243.) The evidence also showed that defendant drove with Miller to Anaheim on the pretext of buying drugs, leading him to a deserted alleyway where Lamb and Rump were waiting for them. When defendant and Miller got halfway down the alley, Lamb and Rump approached them from behind. Moments later, and from that position of advantage, Lamb shot Miller in the back of the head.

We have characterized similar evidence as a "classic lying-in-wait special-circumstance murder." (*People v. Bonilla, supra*, 41 Cal.4th at p. 332, fn. 6.) In *Bonilla*, the defendant drove the victim, a San Francisco entrepreneur, to a vacant office park at night purportedly to meet with a commercial real estate agent. Waiting for them at that location were the defendant's two confederates, one of whom was posing as a commercial real estate agent and the other a security guard. As the four men stood together in the parking lot, the confederates suddenly set upon the victim and threw him into the back of defendant's truck, where they wrapped his head in duct tape until he suffocated. (*Id.* at pp. 321-322.)

Defendant does not contest the sufficiency of the evidence of intent to kill, or the sufficiency of the evidence of watching and waiting for an opportune time to act. He argues, however, that there is no substantial evidence of concealment of purpose.

35

With regard to the element of concealment, we have explained that physical concealment before the attack on the victim is not required. Rather, " '[i]t is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct.' " (*People v. Morales, supra*, 48 Cal.3d at p. 555.) The concealment, in that sense, " 'is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise.' " (*Ibid*.)

Defendant contends that what is lacking in the record is evidence of the required nexus between concealment of purpose and a surprise attack from a position of advantage. With regard to concealment, defendant argues that although defendant may have used the promise of a drug purchase to entice Miller to leave with him, Miller clearly knew defendant's real purpose. According to defendant, Miller was aware of the potential consequences of having been interviewed for the news report on PEN1 and was on his guard. Specifically, in the year following the news report, Miller had told his former girlfriend on several occasions that he was concerned for his safety. At the party in Costa Mesa on the night of the shooting, Miller and defendant joked with one another about Miller keeping his guard up. And sometime later that evening, Miller left his former girlfriend a concerned-sounding voicemail message — with defendant's voice possibly in the background. Furthermore, according to defendant, he had testified at Lamb and Rump's trial that he told Miller at the party that he was going to kill him. Defendant argues that the only reasonable inferences that could be drawn from this evidence was that Miller knew his gang wanted him killed and that he was concerned he would be killed that night because he was out with defendant. In defendant's view, the evidence did not show concealment of purpose but rather that Miller, a drug addict, made a bad choice to go with defendant to get drugs.

36

We reject defendant's assertion that the record lacks substantial evidence of concealment of purpose. Defendant's summary of the facts ignores the gang expert's testimony to the effect that punishment for violating gang rules could be extracted years after the offending act, and McLachlan's remark that Miller was "still running around" because no one had the courage to carry out the gang leadership's order to kill him. This evidence suggested that although Miller may have been aware there would be consequences for participating in the news interview, and may have voiced safety concerns on several occasions during the year following the news broadcast and on the night of the shooting, he did not necessarily expect that the execution would occur when he left the party with defendant to obtain drugs. (See *People v. Arellano* (2004) 125 Cal.App.4th 1088, 1095 [although the recipient of death threats may expect an attack sometime in the future, he or she has no way of knowing when and where the attack will occur].) Indeed, defendant himself acknowledges that the "ultimate time and place of his shooting was most likely unknown to Miller." A reasonable jury could have inferred that Miller would not have gone with defendant and placed himself in a deserted alleyway unless be believed the purpose of doing so was to buy drugs.

Nor do we agree with defendant that there was no substantial evidence of a surprise attack on Miller from a position of advantage. Defendant emphasizes his statement to McLachlan that when he and Miller walked together in the alley and heard the sound of footsteps behind them, Miller asked, "Are those "PEN1 guys?" and was "introduced" to Lamb and Rump. Contrary to defendant's assertion, however, Miller's awareness of Lamb and Rump's presence does not defeat the inference that defendant's concealment of purpose put his fellow gang members in a position of advantage by which to take Miller by surprise. (See *People v. Bonilla, supra*, 41 Cal.4th at pp. 321-322, 332, fn. 6 [the surprise attack on the victim occurred in a deserted parking lot at night as defendant and his two

37

confederates spoke with the victim about a contrived commercial real estate transaction]; *People v. Webster* (1991) 54 Cal.3d 411 [although the victim was aware of defendant's presence, defendant maneuvered himself behind the victim and then attacked him without warning from that position of advantage].) That the shooting occurred shortly after Miller became aware of Lamb and Rump's presence may be inferred from Hughes's testimony that she heard a gunshot in the alley only minutes after Lamb and Rump left her apartment. A surprise attack from a position of advantage also could be inferred from the evidence that Miller's baseball cap and soda can were found underneath his face on the pavement, which suggested he had been caught off guard and dropped these objects at the time he was shot. Defendant argues that the evidence Miller was shot in the back of the head after Lamb and Rump joined up with them showed only that Miller was resigned to being killed. Although McLachlan's testimony relating defendant's account of the killing raised the possibility that Miller was resigned to his fate, the jury was not obligated to accept defendant's assessment of Miller's state of mind at the time of the shooting. We conclude the record contains sufficient evidence from which a rational jury could infer a surprise attack from a position of advantage.

Defendant's challenge to his murder conviction based on lying in wait also fails. We have concluded that the lying-in-wait special circumstance under former section 190.2, subdivision (a)(15) is " ' "slightly different" ' " from, and its elements are " 'more stringent' " than, lying-in-wait first degree murder under section 189. (*People v. Moon*, *supra*, 37 Cal.4th at p. 22; see *People v. Webster*, *supra*, 54 Cal.3d at p. 448 [the lying-in-wait special circumstance requires a finding of intent to kill but lying-in-wait murder requires only a "wanton and reckless intent to inflict injury likely to cause death"].) As discussed *post*, in part II.A.2., the requirements for the amended version of the lying-in-wait special

38

circumstance likewise are more demanding than those for lying-in-wait first degree murder.  Here, sufficient evidence supports the conclusion that, with the intent that Miller would die, defendant aided and abetted an intentional murder committed by lying in wait.  Because sufficient evidence supports the lying-in-wait special-circumstance finding, it necessarily supports the first degree murder verdict based on the theory of lying in wait.  (Cf. *People v. Moon, supra*, at p. 22.)

### 2. *Constitutionality of the lying-in-wait special circumstance*

Defendant argues that the lying-in-wait special-circumstance finding must be vacated, and his death sentence reversed, because the special circumstance is virtually identical to, and thus indistinguishable from, the lying-in-wait theory of first degree murder and, therefore, fails to satisfy the requirements of the Eighth Amendment to the federal Constitution.

Miller's murder occurred in 2002.  As defendant correctly points out, in March 2000, the voters passed Proposition 18, which changed the definition of the lying-in-wait special circumstance from a killing *while* lying in wait to a killing *by means of* lying-in-wait, mirroring the language of the first degree murder statute.  (See Stats. 1998, ch. 629, § 2, p. 4163, enacted as Prop. 18, approved by voters, Primary Elec. (Mar. 7, 2000) eff. Mar. 8, 2000.)  He argues that the amendment rendered the special circumstance virtually identical to first degree lying-in-wait murder and thereby eliminated the guidance needed to prevent its arbitrary and capricious application in violation of the Eighth Amendment.

Recent decisions by this court have noted the change to section 190.2, subdivision (a)(15).  (See, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 246, fn. 7; *People v. Bonilla, supra*, 41 Cal.4th at pp. 333-334.)  Until the present matter, however, we have had no occasion to examine the constitutionality of the amended special circumstance provision.

In assessing defendant's challenge to the amended lying-in-wait special circumstance, we are guided by the following constitutional principles. The Eighth and Fourteenth Amendments prohibit a sentence of death "imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." (*Godfrey v. Georgia* (1980) 446 U.S. 420, 427.) To satisfy this constitutional command, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . . . [T]he aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. [Citation.] Second, the aggravating circumstance may not be unconstitutionally vague." (*Tuilaepa v. California* (1994) 512 U.S. 967, 972.) The lying-in-wait special circumstance is an "aggravating circumstance[ ]" subject to these constitutional requirements. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 467-468.)

Although this court previously has had no occasion to address the meaning and constitutionality of the current version of the lying-in-wait special circumstance, the Fourth District Court of Appeal was called upon to do so in *People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297 (*Bradway*). The Court of Appeal determined that by passing Proposition 18, which changed the special circumstance's former reference to a killing " 'while' " lying in wait to a killing " 'by means of' " lying in wait, the voters intended to conform the temporal connection between the killing and the lying in wait required for the special circumstance to that required for lying-in-wait first degree murder. (*Bradway*, at

40

pp. 307-308.) It also determined that the amended special circumstance was not unconstitutionally vague as applied to Bradway.[4] (*Bradway,* at pp. 309-311.)

We agree with *Bradway* that the voters' adoption of the "by means of" lying-in-wait language mirroring section 189's definition of lying-in-wait murder evidenced an intention to align the special circumstance with lying-in-wait first degree murder in one of the respects that previously had distinguished the two. That conclusion is further supported by the election materials associated with the passage of Proposition 18, as *Bradway* observed. (*Bradway, supra*, 105 Cal.App.4th at pp. 307-308.) The voter information pamphlet shows that voters were informed that the courts had interpreted the special circumstance's reference to a killing "while" lying in wait to require that the murder have "occurred immediately upon a confrontation between the murderer and the victim." According to the Legislative Analyst, this interpretation precluded application of the special circumstance if the defendant watched and waited for the victim, but the killing occurred after the defendant had captured the victim and transported him or her to another location. (Voter Information Pamp., Primary Elec. (Mar. 7, 2000) Legis. Analyst's analysis of Prop. 18, p. 33.) The Legislative Analyst explained that the passage of Proposition 18 would replace the special circumstance's previous language with reference to a killing "by means of" lying

---

**4**      Because Bradway was sentenced to life without the possibility of parole, rather than death, his constitutional challenge to the lying-in-wait special circumstance arose as a void-for-vagueness claim under the due process clause. (*Bradway, supra*, 105 Cal.App.4th at p. 309.) However, his vagueness challenge echoed the "specialized concept of vagueness most clearly defined by the [United States] Supreme Court in dealing with Eighth Amendment challenges to death penalties." (*Bradway v. Cate* (9th Cir. 2009) 588 F.3d 990, 991.)

41

in wait, thereby permitting application of the special circumstance in that previously prohibited scenario. (*Ibid*.; see *Bradway*, *supra*, at p. 308.)

Having determined that the voters' purpose in amending the lying-in-wait special circumstance was to eliminate the temporal distinction between the special circumstance and lying-in-wait first degree murder, and thereby expand the class of cases in which the special circumstance could be found true, the question remains whether the special circumstance provision still adequately distinguishes itself from other murders and does so in terms that are not so vague as to permit arbitrary determinations regarding the truth of the special circumstance allegation. (*Tuilaepa v. California, supra,* 512 U.S. at pp. 971-972.) For the reasons explained below, we conclude that the amended lying-in-wait special circumstance satisfies the Eighth Amendment in both respects.

*People v. Morales, supra*, 48 Cal.3d 527, 557, upheld the constitutionality of section 190.2, former subdivision (a)(15), concluding that the factual matrix presented by an intentional murder that met the elements of concealment, watching and waiting, and a surprise attack from a position of advantage that are required to establish lying-in-wait first degree murder rendered it "sufficiently distinct from 'ordinary' premeditated murder to justify treating it as a special circumstance." These characteristics of the former special circumstance provision, which established that it was neither applicable to all murderers nor impermissibly vague, apply with equal force to the amended version. (See *People v. Jurado* (2006) 38 Cal.4th 72, 146-147, conc. opn. of Kennard, J. [former lying-in-wait special circumstance does not violate the federal Constitution because it "applies only to a subclass of murderers, not to all murderers, and it is not unconstitutionally vague"]; cf. *People v. Beames* (2007) 40 Cal.4th 907, 933-934 [adopting the reasoning of the concurring opinion in *People v. Jurado, supra*, at p. 146, to conclude that California's death penalty law as a whole is not

42

impermissibly broad because the enumerated special circumstances "apply only to a subclass of murderers, not to all murderers"].)

Indeed, this court's decisions resolving Eighth Amendment challenges to other special circumstance provisions support the conclusion that the amended lying-in-wait special circumstance would satisfy federal constitutional requirements for death eligibility even were the amendment to have made the special circumstance *identical* to lying-in-wait first degree murder. In *People v. Catlin* (2001) 26 Cal.4th 81, this court upheld the murder-by-poison special circumstance finding against a claim that it violates the Eighth Amendment in that it merely repeats the elements of first degree murder-by-poison. In rejecting that challenge, we observed in relevant part that murder by poison is particularly reprehensible: The murderer acts surreptitiously and thereby prevents the victim any chance at self-defense. (*Id*. at p. 159.) Like the murderer who poisons his victim, the murderer who kills by lying in wait acts surreptitiously, concealing himself or his purpose and making a surprise attack on his victim from a position of advantage, thereby denying the victim any chance of escape, aid, or self-defense. It is no surprise that a murder committed by lying in wait historically has been viewed as " 'a particularly heinous and repugnant crime.' " (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1023.) That a crime historically has been considered more reprehensible than other murders provides "a rational basis for distinguishing those murderers who deserve to be considered for the death penalty from those who do not." (*People v. Davenport* (1985) 41 Cal.3d 247, 270, see *id*. at p. 269 [the torture-murderer's " ' "cold blooded intent to inflict pain for personal gain or satisfaction" ' " sets him apart from others who commit murder with malice aforethought and renders torture murder to be one of the most reprehensible crimes].)

Defendant argues further that even were we to decide that the amended version of the lying-in-wait special circumstance does not on its face offend the Eighth Amendment, the special circumstance provision cannot be constitutionally applied in his case. Specifically, he asserts that because his liability for lying-in-wait first degree murder as an aider and abettor required a showing of intent to kill, there was no meaningful distinction between that theory of first degree murder and the lying-in-wait special circumstance in his case, making it unnecessary for the jury to consider any additional information when deciding the truth of the special circumstance allegation and rendering a true finding inevitable. Defendant's as-applied challenge is essentially the same argument as his facial attack, which we have rejected for the reasons discussed above. (See *People v. Lewis* (2008) 43 Cal.4th 415, 517.) The lying-in-wait special circumstance allegation that applied in this case, like its predecessor, "is limited to intentional murders that involve a concealment of purpose and a meaningful period of watching and waiting for an opportune time to attack, followed by a surprise lethal attack on an unsuspecting victim from a position of advantage." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1310.) Here, the jury's finding was based on evidence that defendant's actions satisfied the lying-in-wait special circumstance. With the intent that Miller would be killed, defendant drove with him to Anaheim on the pretext of buying drugs, and led him into an alley where Lamb and Rump were waiting to execute him. When defendant and Miller got halfway down the alley, Lamb and Rump approached from behind and, from that position of advantage, Lamb carried out a surprise attack by shooting Miller in the back of the head. The application of the lying-in-wait special circumstance to such a scenario does not offend the Eighth Amendment.

### 3. Instruction that an aider and abettor and the direct perpetrator are "equally guilty"

As previously mentioned, the prosecutor's theory of the case was that defendant aided and abetted the murder of Scott Miller by luring him to a deserted alley where Lamb executed him with a shot to the back of the head. In connection with that theory, the trial court instructed the jury on the principles of aider and abettor liability, introducing the theory with former CALCRIM No. 400. As the instruction read at the time of defendant's trial, the court stated as follows. "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted the perpetrator, who directly committed the crime. A person is *equally guilty* of the crime whether he committed it personally or aided and abetted the perpetrator who committed it." (See CALCRIM No. 400 (Aug. 2009), italics added.)

Focusing on the "equally guilty" language italicized above, defendant argues that instructing with former CALCRIM No. 400 violated his right to due process because the instruction misdescribed the prosecution's burden of proving his liability as an aider and abettor and permitted the jury to convict him of first degree murder based on the culpability of the perpetrator Lamb, without considering his own mental state. As defendant points out, an aider and abettor's criminal liability may sometimes be greater than, or lesser than, that of the perpetrator. But, he argues, if the jurors concluded that Lamb premeditated and deliberated the murder, they were "duty bound" under former CALCRIM No. 400 to find defendant guilty of first degree murder, even if they believed defendant did not harbor the requisite mental state for first degree murder.

As a threshold matter, the Attorney General asserts that defendant's claim of instructional error was not preserved for appeal because defense counsel neither

45

objected to, nor sought modification of, former CALCRIM No. 400 at trial. This court has observed that, as a general matter, " ' "a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1348; accord, *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [challenge to former CALCRIM No. 400's " 'equally guilty' " language forfeited by the failure to object].) We also have recognized, however, that an appellate court may review any instruction, even when there was no objection or request for modification below, "if the substantial rights of the defendant were affected thereby." (§ 1259; see, e.g., *People v. Johnson* (2015) 60 Cal.4th 966, 993.) Here, defendant contends that instructing the jury with the "equally guilty" language in former CALCRIM No. 400 violated his state and federal constitutional rights to due process because it allowed the jury to convict him of first degree murder based on the mental state of the perpetrator, without considering defendant's own mental state. Were that argument to prevail, the error in giving former CALCRIM No. 400 arguably would have affected defendant's substantial rights. (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [a claim that an instruction misstated the law or violated the due process clause "is not of the type that must be preserved by objection"].) This court concluded in *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 432 (*Bryant*), that a former version of CALJIC No. 3.00, an instruction similar to the one at issue here, "generally stated a correct rule of law." We nonetheless assumed the defendants' challenge to the " 'equally guilty' " language in that instruction was not forfeited for lack of objection and reached the merits of their claim, as permitted under section 1259. (*Bryant, supra*, at p. 432.) We take a similar approach here.

As defendant correctly observes, former CALCRIM No. 400 was revised subsequent to his trial. Prompting the modification that appears in the current version of the instruction were two Court of Appeal decisions concluding that former CALCRIM No. 400 was inconsistent with this court's opinion in *People v. McCoy* (2001) 25 Cal.4th 1111. In *McCoy*, this court rejected the notion that an aider and abettor cannot be found guilty of a greater offense than that committed by the perpetrator. As we observed, aider and abettor liability for a killing is based on the combined acts of all the principals and the aider and abettor's own mental state, which " ' "float[s] free" ' " from the mental state of the perpetrator. (*Id*. at p. 1119.) When the aider and abettor's mental state is more culpable than that of the actual perpetrator, the aider and abettor may be guilty of a more serious crime. (*Id*. at p. 1120.)

In *People v. Samaniego, supra*, 172 Cal.App.4th 1148, and *People v. Nero* (2010) 181 Cal.App.4th 504, the Courts of Appeal understood *McCoy*'s reasoning to support the further proposition that an aider and abettor's criminal liability may be *less* than that of the perpetrator, depending on the aider and abettor's mental state. (*Samaniego, supra*, at pp. 1163-1164; *Nero, supra*, at pp. 513-517.) Although the Court of Appeal in *Samaniego* found that former CALCRIM No. 400's reference to principals being " 'equally guilty' " of a crime was a generally correct statement of the law, it concluded that the instruction was misleading in light of the unique facts of that case, in which three defendants were convicted of two counts of first degree murder but the evidence did not establish which of the three defendants was the actual perpetrator. (*People v. Samaniego, supra*, at pp. 1162, 1165.) The Court of Appeal in *Nero* concluded, however, that former CALJIC No. 3.00, the instruction similar to former CALCRIM No. 400, was confusing even in unexceptional cases, and recommended that it be modified. (*People v. Nero, supra*, at p. 518.) The Judicial Council adopted that suggestion in

47

April 2010, revising former CALCRIM No. 400 by removing the word "equally" from the phrase "equally guilty."**5**

This court found in *Bryant, supra*, 60 Cal.4th 335, that former CALJIC No. 3.00, the instruction similar to the former version of CALCRIM No. 400 at issue here, generally stated a correct rule of law. (*Id*. at p. 433.) We observed that "[a]ll principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*Ibid*.) Our decision in *Bryant* also recognized, however, that the instruction could be misleading in a case in which the principals might be guilty of different crimes and the jury believes the instruction prevents such a verdict. (*Ibid*.) As explained below, the jury would not have been misled in this respect in the present matter.

First, there was no version of the evidence in this case suggesting that defendant's mental state was less culpable than that of the actual killer. Defendant's statements to McLachlan detailing his significant involvement in the killing — including his description of having used the pretext of a drug purchase

---

**5**    In relevant part, CALCRIM No. 400 now reads as follows. "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (See Judicial Council of Cal., Crim. Jury Instns. (Apr. 2010 supp.) Bench Notes to CALCRIM No. 400, p. 28.)

Former CALJIC No. 3.00 likewise was modified in 2010, making the "equally guilty" language optional. That instruction now states in relevant part, "Persons who are involved in [committing] [or] [attempting to commit] a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is [equally guilty.] [guilty of a crime.]" The use note indicates that in cases presenting the issue whether the aider and abettor's mens rea suggests his or her guilt may be greater or lesser than that of the actual perpetrator, the court should instruct with the "guilty of a crime" language instead of "equally guilty." (Use Note to CALJIC No. 3.00 (Spring 2010 rev.).)

to lure Miller to the alley where Lamb and Rump were waiting, and later having had words with Lamb for shooting Miller from behind rather than confronting him about his transgressions face to face before killing him — left little question that defendant "share[d] the murderous intent of the actual perpetrator." (*People v. McCoy, supra*, 25 Cal.4th at p. 1118.)

Nor was there anything in the record suggesting that the jurors may have believed the "equally guilty" language in former CALCRIM No. 400 required them to determine defendant's criminal liability based on Lamb's mental state at the time of the killing, rather than considering defendant's own mental state. The court introduced the subject of aider and abettor liability by reading former CALCRIM No. 400. It then instructed the jury with CALCRIM No. 401, which sets out the requirements for establishing aider and abettor liability. The jury therefore was informed that for them to find defendant guilty of murder as an aider and abettor the prosecution must prove that defendant knew Lamb intended to kill Miller, that he intended to aid and abet Lamb in committing the killing, and that he did in fact aid him in that killing, which would have cleared up any ambiguity arguably presented by former CALCRIM No. 400's reference to principals being "equally guilty." This is not a case like *People v. Nero, supra*, 181 Cal.App.4th 504, in which the jury expressly asked during deliberations whether it could find the aider and abettor codefendant guilty of a higher or lesser degree of murder than the codefendant who was the actual killer, and the court responded by merely rereading former CALJIC No. 3.00, which included the "equally guilty" language. (*Nero*, at p. 518.)

In sum, we conclude that, based on the record before us in this case, there was no reasonable likelihood the jurors would have understood the "equally guilty" language in former CALCRIM No. 400 to allow them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather

49

than on defendant's own mental state in aiding and abetting the killing. (*People v. Clair* (1992) 2 Cal.4th 629, 663; *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

### 4. Prior-murder special circumstance finding based on a murder that occurred after the capital offense

After the jury returned its verdicts in the guilt phase of trial, the trial court conducted a court trial on the special circumstance allegation that defendant "was convicted previously of murder in the first or second degree" (§ 190.2, subd. (a)(2)), and found the allegation to be true. The victim of that murder was Cory Lamons, who was killed in April 2004. In June 2004, defendant pleaded guilty to second degree murder for his involvement in that crime.

Pointing out that the murder of Cory Lamons occurred two years *after* the murder of Scott Miller in March 2002, defendant argues that the prior-murder special circumstance finding should be vacated because, contrary to federal constitutional requirements, he was not on notice at the time of the Miller murder that he was subjecting himself to death eligibility for a prior murder conviction. Defendant also complains that the prior-murder special circumstance allegation, as applied to him, is vague and overbroad and bears no relationship to the capital murder itself, in violation of Eighth Amendment commands.

We observe that section 190.2, subdivision (a)(2), was in effect at the time of Miller's murder. This court long ago explained that "[t]he unambiguous language and purpose of section 190.2(a)(2) . . . require that a person such as defendant, already convicted of murder in a prior proceeding, must be considered eligible for the death penalty if convicted of first degree murder in a subsequent trial. The order of the commission of the homicides is immaterial." (*People v. Hendricks* (1987) 43 Cal.3d 584, 596.)

Defendant acknowledges that this court has repeatedly rejected constitutional challenges to the prior-murder special circumstance provision, but

50

asks that we reconsider our prior pronouncements in this regard. Because he provides no new argument or legal developments warranting reexamination of our prior decisions, we decline his invitation to do so. (See *People v. Rogers* (2013) 57 Cal.4th 296, 340-344; *People v. Gurule* (2002) 28 Cal.4th 557, 635-637.)

### B. Penalty Phase Claims

#### 1. *Victim impact testimony relating to a murder other than the capital crime*

Defendant contends the trial court erred in allowing the prosecutor to present victim impact evidence relating to noncapital crimes, including the noncapital murder of Cory Lamons. He argues that such evidence is inadmissible as a factor in aggravation under state law and that its admission violated his rights to due process, trial before an impartial jury, and a reliable penalty determination guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments and their state constitutional counterparts. We conclude to the contrary that there was no statutory or constitutional bar to admitting the evidence in question.

#### a. *Background*

The court, sitting as trier of fact in a bifurcated guilt phase proceeding to determine the truth of the prior-murder special-circumstance allegation, found beyond a reasonable doubt that defendant previously had been convicted of the second degree murder of Cory Lamons. (§ 190.2, subd. (a)(2).) At the penalty phase of trial, the court informed the jury of its finding and the prosecutor called several witnesses to testify regarding the circumstances of that crime as evidence of "other violent criminal activity" pursuant to section 190.3, factor (b).

Prior to trial, the prosecutor had filed a written motion seeking admission of victim impact testimony relating to defendant's "other violent criminal activity" generally. The defense filed a written response objecting to the presentation of such evidence generally, and arguing in part that even if victim impact evidence is

51

permitted under section 190.3, factor (b) (factor (b)), its admission should be limited to testimony by the actual victim of the crime, and that testimony by relatives does not fall within the scope of factor (b) evidence. At a pretrial hearing on the motion, the prosecutor asserted that the defense position allowing victim impact testimony relating to factor (b) crimes if the victim survived but not if the victim died is a distinction not contemplated in the relevant case law. He argued that, with regard to the Lamons murder, for example, it would be proper to call the victim's mother to testify about the impact of that crime. Defense counsel submitted the issue based on his written motion objecting to the factor (b) victim impact testimony generally. With regard to testimony by Lamons's mother specifically, counsel added that the crime of murder speaks for itself and the finality of murder is so obvious that the jury does not need a witness to testify about it. The court concluded that the case law supported admission of testimony by Lamons's mother and overruled the defense objection without prejudice to counsel's raising other objections to that evidence later in the proceedings.

With no further objections by defense counsel, the prosecutor called several witnesses to testify regarding Lamons's murder. Cory Lamons's mother, Sharon Thompson, was the last of these witnesses. During her testimony, she described how life changed for her and Lamons's older sister after her son's death. For example, she stated, she tries not to allow anyone to get close to her because she does not want to "hurt like that again." She also explained that the worst part for her may be knowing her son died a violent death and that she was not there to protect him. Thompson told the jury that she moved out of the state after her son's death because she could not cope, that she misses him every day, and that "[i]t will never get any easier."

During closing argument, the prosecutor referred to Thompson's testimony several times, reminding the jury how life had changed for the worse for

Thompson and her daughter after Lamons's violent death, and urging the jury to give weight to the impact of Lamons's murder on his mother when evaluating the factor (b) evidence.

### b. *Discussion*

Defendant contends that the admission of victim impact evidence relating to a crime other than the capital offense exceeded the constitutionally permissible scope of such aggravating evidence under the principles established in *Payne v. Tennessee* (1991) 501 U.S. 808 (*Payne*). Defendant further asserts that the jury was improperly influenced in its penalty determination by the irrelevant, highly emotional, and prejudicial victim impact evidence relating to the noncapital murder of Cory Lamons.

As a preliminary matter, the Attorney General asserts that defendant's claim is forfeited because defense counsel did not object to the factor (b) victim impact evidence on the ground that the admissibility of such evidence is limited to the circumstances of the capital offense. We find to the contrary that defendant's argument was fairly included in defense counsel's objection to the prosecutor's motion to admit victim impact evidence relating to factor (b) criminal activity generally. The prosecutor's written motion asking the court to admit the victim impact evidence argued that the law allowed jurors to consider not just victim impact evidence relating to the capital murder, but also to consider victim impact evidence relating to the "victims and surviving victims" of the defendant's factor (b) crimes. In a written response, which was captioned, "The Defense Objects to Victim Impact Statements of Factor (b) Crimes," defense counsel maintained that such evidence is not admissible at all unless it is relevant to proving that the incident in question met the definition of factor (b) criminal activity. In a fallback position, counsel's written motion further argued that even

53

if victim impact evidence is relevant to crimes unrelated to the capital offense, the admission of such evidence should be limited to testimony by the actual victims, not family or friends of the victims. Although counsel raised only the latter point at the hearing on the motion, he submitted the issue on his written motion. On this record, we conclude the claim that victim impact evidence is permissible only as it relates to the capital offense is an argument that was fairly included in defendant's objection below and, therefore, is preserved for appeal.

We reach a different conclusion, however, to the extent defendant claims that the testimony by Lamons's mother was highly emotional and prejudicial and thereby improperly influenced the jury. As previously mentioned, the trial court overruled the defense objection to the factor (b) victim impact testimony without prejudice, expressly affording defense counsel an opportunity to raise other objections to the challenged testimony. Counsel did not object to the testimony by Lamons's mother on the ground it was unduly emotional or prejudicial, either before or during its presentation. Defendant, therefore, has not preserved that issue for appeal. (*People v. Mills* (2010) 48 Cal.4th 158, 170 ["[a]s a general matter, when a trial court denies a motion without prejudice the matter is forfeited if not renewed"].)

Although defendant did not forfeit his claim regarding the propriety of admitting victim impact evidence relating to crimes other than the capital offense, as we explain, his contention does not succeed.

In making its penalty determination, the jury is authorized to consider three types of aggravating evidence, "the circumstances of the crime of which the defendant was convicted in the present proceeding" (§ 190.3, factor (a)), "the presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" (§ 190.3, factor (b)), and "the presence . . . of any prior felony

54

conviction" (§ 190.3, factor (c)).  (See *People v. Boyd* (1985) 38 Cal.3d 762, 774.)
This court has long construed factor (b) to encompass the "nature and
circumstances" of the defendant's violent criminal activity (*People v. Benson*
(1990) 52 Cal.3d 754, 797), including the emotional impact on the victims of those
crimes.  (*People v. Jones* (2012) 54 Cal.4th 1, 73; *People v. Virgil* (2011)
51 Cal.4th 1210, 1276; *People v. Bramit* (2009) 46 Cal.4th 1221, 1241; *People v.
Demetrulias* (2006) 39 Cal.4th 1, 39; *People v. Price* (1991) 1 Cal.4th 324, 479
[the penalty phase jury may properly consider evidence regarding the emotional
effect on the victims of the defendant's prior violent crimes].)

In *Booth v. Maryland* (1987) 482 U.S. 496 (*Booth*) and *South Carolina v.
Gathers* (1987) 490 U.S. 805 (*Gathers*), the United State Supreme Court held that
evidence and related argument regarding a capital murder victim's personal
characteristics and the emotional impact of the victim's death on his or her family
members were not relevant to any issue the jury was called upon to decide when
selecting the appropriate penalty and, therefore, their admission was prohibited by
the Eighth Amendment.

This court has concluded, however, that *Booth* and *Gathers* had no bearing
on the admissibility of "evidence or argument relating to the nature and
circumstances of other criminal activity involving the use or threat of force or
violence or the effect of such criminal activity on the victims."  (*People v. Benson,
supra,* 52 Cal.3d at p. 797; accord, *People v. Karis* (1988) 46 Cal.3d 612, 640-
641.)  To the contrary, this court has found that evidence or argument regarding
the impact of a capital defendant's factor (b) crimes on the victims of those crimes
was "highly relevant to the life-or-death decision."  (*Benson*, *supra*, at p. 797; see
*Karis*, *supra*, at p. 641.)

In *Payne, supra*, 501 U.S. 808, 827, the high court overruled its prior
decisions in *Booth* and *Gathers* and announced that the Eighth Amendment does

55

*not* bar states from permitting the admission of victim impact evidence. As the court explained, "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." (*Payne, supra*, at p. 825.) Central to the court's decision in *Payne* was the notion that the prosecution has a legitimate interest in counteracting the mitigating evidence that the defendant is entitled to present to the jury. (*Ibid.*) *Payne* criticized *Booth* for having "unfairly weighted the scale in a capital trial," which places no limitations on the defendant's presentation of relevant mitigating evidence regarding his own circumstances but, under *Booth*, precluded the prosecution from showing the loss to the victim's family that resulted from the defendant's homicide. (*Payne*, at. p. 822.)

Subsequent to *Payne*, this court held in *People v. Edwards* (1991) 54 Cal.3d 787 (*Edwards*) that section 190.3, factor (a), regarding the circumstances of the capital crime, authorizes "evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim." (*Edwards,* at p. 835.) And, as previously mentioned, both before and after the decision in *Payne*, this court has repeatedly recognized the relevance of victim impact evidence relating to factor (b) crimes of violence.

Defendant acknowledges the numerous decisions upholding the admissibility of victim impact evidence under section 190.3, factor (b). He points out, however, that in *People v. Boyde* (1988) 46 Cal.3d 212, 249 (*Boyde*) this court reached the contrary conclusion that section 190.3, factor (b), did *not* permit victims of the defendant's prior offenses to testify regarding the impact that the crimes had had on their lives. As defendant correctly observes, no decision has expressly addressed the apparent inconsistency between *Boyde* and the many decisions approving evidence and argument regarding the impact on the victims of

a defendant's factor (b) criminal activity. He argues in this regard that *Boyde* was correctly decided because the plain language of section 190.3, factor (b) does not support the conclusion that the electorate, in enacting the death penalty law, intended to allow victim impact testimony regarding crimes unrelated to the capital murder.

Defendant's statutory construction argument is premised on a textual distinction between section 190.3, factors (a) and (b). Specifically, he emphasizes that although factor (a) expressly refers to the "circumstances" of the capital crime, no such language appears in factor (b). Defendant points out that *Edwards* found the commonly understood meaning of the "*circumstances* of the crime of which the defendant was convicted in the present proceeding" (§ 190.3, factor (a), italics added), included "the specific harm caused by the defendant," which in turn included the impact on the victim's family. (*Edwards, supra*, 54 Cal.3d at p. 835.) In defendant's view, had the electorate intended factor (b) to permit victim impact testimony, it likewise would have referred to the "circumstances" of the prior criminal activity.

Defendant fails to persuade that the textual distinction between factors (a) and (b) compels the conclusion that the electorate intended to preclude victim impact testimony and argument relating to violent criminal activity other than the capital crime. Notwithstanding the difference in text, and as previously discussed, this court has long construed factor (b) as permitting "evidence showing *the circumstances* of the prior violent criminal activity." (*People v. Brown* (1988) 46 Cal.3d 432, 445, italics added; accord, *People v. Benson, supra,* 52 Cal.3d at p. 797; *People v. Karis, supra,* 46 Cal.3d at p. 640.) Victim impact evidence relating to factor (b) crimes, like evidence regarding other circumstances of that criminal activity, serves to "fully illuminate their seriousness" (*People v. Holloway* (2004) 33 Cal.4th 96, 143), thereby assisting the penalty phase jury in its

assessment of "the character and record of the defendant." (*People v. Karis, supra*, at p. 640.)

Nor are we persuaded that this court's decision in *Edwards* supports defendant's statutory construction argument. Defendant is correct that *Edwards* focused on section 190.3, factor (a)'s express reference to the "circumstances" of the capital crime when construing that provision to contemplate the admission of victim impact testimony. This was not the only basis of the holding in *Edwards*, however. Notably, *Edwards* also relied on *People v. Benson, supra,* 52 Cal.3d 754, which found no impropriety in the prosecutor's argument regarding the impact on the victims of the defendant's other violent criminal conduct. (*Id*. at pp. 795-797.) *Benson* viewed that information as "highly relevant to the life-or-death decision." (*Id*. at p. 797.) In a footnote, *Benson* expressly declined to decide whether *Booth* and *Gathers* would prohibit the admission of evidence and argument regarding the emotional impact of factor (b) criminal activity on the victim's family. (*Benson*, at p. 797, fn. 9.) But *Edwards* read *Benson* to "strongly" imply that such evidence or argument fell within the scope of section 190.3, factor (b). (*Edwards*, *supra*, 54 Cal.3d at p. 835.) With that understanding of *Benson* in mind, the court in *Edwards* reasoned that "[i]f victim impact evidence is permitted under factor (b), it should certainly be permitted under factor (a)." (*Edwards, supra*, at p. 835.)

We furthermore find no basis on which to conclude that *Boyde* states the better rule, as defendant maintains. In *Boyde*, the prosecution presented testimony by eight victims of the defendant's prior robberies and assaults. When describing the circumstances of those incidents, the witnesses mentioned how the crimes had affected their lives. (*Boyde, supra*, 46 Cal.3d at pp. 247, 249.) The court in *Boyde* agreed with the defendant that the "testimony by victims of other offenses about the impact that the event had on their lives" was improperly admitted because it

58

was unrelated to any of the statutory aggravating factors. (*Id*. at p. 249.) However, that single sentence comprised the opinion's entire discussion of the issue; there was neither statutory analysis nor citation to authority. The decision's cursory treatment of the issue provides us with no reasoned basis on which to adopt its conclusion.

Until the present matter, this court's decisions have largely ignored *Boyde*'s anomalous conclusion. Its holding, however, is inconsistent with every other pronouncement by this court on the subject, including a decision that was issued in the very same month that *Boyde* was filed. (See *People v. Karis, supra*, 46 Cal.3d at p. 641 ["we believe that the impact of a capital defendant's [noncapital] crimes on the victims of those crimes is relevant to the penalty decision"].) We therefore expressly overrule *Boyde* to the extent it concludes that victim impact evidence relating to factor (b) criminal activity is inadmissible, and reaffirm the unbroken line of authority beginning with *People v. Benson, supra,* 52 Cal.3d 754, which has approved evidence and prosecutorial argument regarding the impact of the defendant's factor (b) crimes on the victims of that criminal activity.

We conclude furthermore that evidence and argument regarding the impact of a factor (b) homicide on a member of the victim's family is relevant to the jury's penalty determination, subject to the same limitations on its admissibility that govern victim impact evidence as it relates to the capital crime. (See *Edwards, supra*, 54 Cal.3d at p. 836, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864 [cautioning against the admission of "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response"].) Defense counsel argued below that victim impact testimony by a noncapital homicide victim's family member is unnecessary because the severity of the crime of murder "speaks for itself." We disagree. In the court's discretion, admission of victim impact testimony by the

59

loved one of a victim of a factor (b) homicide serves to "fully illuminate [its] seriousness." (*People v. Holloway, supra,* 33 Cal.4th at p. 143; see *People v. Price, supra,* 1 Cal.4th at p. 479 [an emotional reaction from a factor (b) victim provides "an assessment of the seriousness of [the] defendant's criminal conduct"]; see, e.g., *People v. Johnson* (2015) 60 Cal.4th 966, 976, 993 [the father of the victim of a manslaughter, evidence of which was admitted as a factor (b) crime of violence, testified about his daughter and the impact of her death]; *People v. Adams* (2014) 60 Cal.4th 541, 557-558 [the husband and son of the victim of a murder admitted as factor (b) evidence testified regarding how the fatal shooting had affected them, both in its immediate aftermath and long term].) It would be anomalous to permit the penalty phase jury to consider the emotional suffering caused to the victim of the defendant's nonfatal violent criminal activity but to preclude from the jury's moral assessment the suffering caused by the defendant's commission of a factor (b) homicide.

As this court has observed in the context of capital crimes, "[v]ictim impact evidence is admissible to establish the unique loss resulting from a murder and thereby to counteract the defendant's mitigating evidence." (*People v. Suff* (2014) 58 Cal.4th 1013, 1074-1075.) The same purpose is served when the loss results from a noncapital homicide presented under factor (b). In both settings, the jury is assisted in its assessment of the defendant's moral culpability and blameworthiness with evidence of "the specific harm caused by the defendant." (*Edwards, supra,* 54 Cal.3d at p. 835; see *Payne, supra,* 501 U.S. at p. 825.) Victim impact evidence relating to a factor (b) homicide is particularly relevant in a case such as the present matter, in which the testimony by the homicide victim's mother regarding the impact of her son's murder on her and her daughter served as a counterweight to defendant's case in mitigation. As previously recounted, the defense mental health expert, Dr. Flores, testified that defendant's violent actions

and behavior were governed by defendant's own moral and ethical code. Defendant himself attempted to minimize the seriousness of his prior acts of violence by explaining to the jury that he directed his acts of violence at drug users and dealers, gang members, and convicts. More specifically, he stated that Cory Lamons was a drug addict who owed him money and had stolen from two women he knew.[6]

In addition to arguing that the electorate did not intend to permit victim impact evidence relating to factor (b) crimes, defendant asserts that the admission of such evidence in his case amounted to federal constitutional error. He acknowledges that our decisions have consistently held that victim impact evidence relating to factor (b) criminal activity does not violate the federal or state Constitution. (See, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1276.) He

---

[6] We disapprove *People v. Levitt* (1984) 156 Cal.App.3d 500, to the extent it held that evidence regarding the impact of a homicide victim's death on a family member is *never* relevant to the sentencing determination. The *Levitt* decision, which was cited with approval in *Booth, supra*, 482 U.S. 496, 505-505, footnote 7, states that "the fact that a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than his commission of homicide in the first place. Such bereavement is relevant to damages in a civil action, but it has no relationship to the proper purposes of sentencing in a criminal case." (*Levitt*, at pp. 516-517.) That proposition is plainly inconsistent with *Edwards, supra*, 54 Cal.3d 787, and our conclusion in the present matter, that, in the court's discretion, such victim impact evidence *is* relevant to the jury's life-or-death decision. With regard to a judge's sentencing determination in a noncapital case, *Levitt*'s conclusion is contrary to article I, section 28, of the California Constitution, and section 1191.1, enacted in 1982 pursuant to initiative by the passage of Proposition 8, "The Victim's Bill of Rights." In relevant part, section 1191.1 requires the criminal sentencing judge to consider a victim impact statement by a deceased victim's "next of kin" expressing his or her views regarding the crime. (See *People v. Mockel* (1990) 226 Cal.App.3d 581, 587 [the court at sentencing had a duty under § 1191.1 to hear and consider the emotional, grief-stricken statement by the wife of the vehicular manslaughter victim].)

61

nonetheless seeks our reconsideration of those decisions in light of opinions from the highest state courts of Illinois, Nevada, and Tennessee, which he claims have concluded that such evidence violates the federal Constitution. (See *People v. Hope* (Ill. 1998) 702 N.E.2d 1282, 1287-1289; *Sherman v. State* (Nev. 1998) 965 P.2d 903, 913-914; *State v. Nesbit* (Tenn. 1998) 978 S.W.2d 872, 891, fn. 11; *State v. Bigbee* (Tenn. 1994) 885 S.W.2d 797, 812.)

Some of these out-of-state cases have held that victim impact evidence relating to a noncapital crime is irrelevant under that state's death penalty scheme, which differs in significant respects from our own. (See, e.g., *Sherman v. State,* 965 P.2d at pp. 913-914; see also *People v. Davis* (2009) 46 Cal.4th 539, 618 [rejecting on similar grounds a nearly identical challenge to the admissibility of factor (b) victim impact evidence]; *People v. Virgil*, *supra*, 51 Cal.4th at p. 1276 [relying on *Davis* to reject a similar challenge].) Although other out-of-state decisions have concluded that *Payne* does not contemplate victim impact testimony relating to a noncapital crime (see, e.g., *Cantu v. State* (Tex.Crim.App. 1997) 939 S.W.2d 627, 637-638), we are neither bound nor persuaded by their conclusions. Indeed, *Payne*'s reasoning suggests that it indirectly supports the admissibility of factor (b) victim impact evidence and argument. As previously discussed, central to *Payne*'s holding was the notion of striking a more appropriate balance between the nearly unlimited scope of mitigating evidence that a defendant is entitled to introduce and the prosecution's narrowly circumscribed evidence in aggravation.

We previously have declined to depart from our prior conclusion that the admission of victim impact evidence regarding noncapital crimes does not violate the federal Constitution. (*People v. Virgil, supra*, 51 Cal.45th at p. 1276; *People v. Davis, supra,* 46 Cal.4th at p. 618.) Defendant's argument here provides no additional reasons to reconsider our precedents on the subject.

62

## 2. *Addressing jurors individually during closing argument*

Defendant contends that the prosecutor committed reversible misconduct during closing remarks at the penalty phase by addressing his argument to jurors individually rather than as a group. We conclude that defendant has forfeited his claim because counsel failed to object, and that his claim of ineffective assistance of counsel based on that omission is more appropriately raised in a petition for writ of habeas corpus.

### a. *Background*

Near the end of the prosecutor's closing argument, he emphasized that defendant himself was the only one to blame — not drug abuse, his family, his teachers, society or the prison system — for "all the agony that he caused, for all the hurt that he caused, for all the violence that he caused." With regard to the harm caused by defendant, the prosecutor argued that "[j]ustice will be served when those who are not injured by crime feel as indignant as those who are. That's when justice is served. When people who are not directly injured by the crime feel as indignant as those that are." Continuing with this theme, the prosecutor then addressed each of the 12 jurors individually as follows:

"Are you indignant yet, sir?

"Are you indignant yet?

"How about you, sir? Are you indignant yet?

"How about you, sir? Are you indignant yet?

"How about you, sir? Are you indignant yet, sir?

"How about you, sir?

"How about you sir, Are you indignant yet?

"How about you, ma'am?

"How about you, sir?

"How about you ma'am?

63

"How about you ma'am?

"How about you ma'am?"

Nothing in the record suggests that any juror responded to the prosecutor's individual query.

Directing his remarks to the jury as a whole again, the prosecutor then stated, "Enough is enough," and asked jurors whether they feel what the family members of Scott Miller and Cory Lamons feel. "Don't say yes," the prosecutor cautioned, "because you don't unless you have lost a daughter or a son." The prosecutor urged the jury, however, to "put a value on it. Put a value on it. Is it enough yet?" Referring to the two murders as defendant's "partial trail of blood and horror," the prosecutor reiterated, "Enough is enough," and argued that defendant had forfeited his right to live and "so richly deserves the ultimate punishment."

### b. Discussion

Defendant argues that the prosecutor committed egregious misconduct by addressing each juror individually during closing argument in violation of his right to due process.

" ' "When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated." ' [Citations.]" (*People v. Shazier* (2014) 60 Cal.4th 109, 127.) " ' "Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." [Citation.]' " (*Ibid.*; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

64

This court's decision in *People v. Wein* (1958) 50 Cal.2d 383, 395, states the rule that "arguments should be addressed to the jury as a body and the practice of addressing individual jurors by name during the argument should be condemned rather than approved . . . ." Relying on *Wein*, the Court of Appeal held in *People v. Sawyer* (1967) 256 Cal.App.2d 66, 78, that the prosecutor should not have addressed the jurors individually as "sir" or "ma'am" during closing argument. More recently, this court relied on *Wein* to conclude in *People v. Freeman* (1994) 8 Cal.4th 450, 517-518, that it was improper during penalty phase argument for the prosecutor to quote a seated juror's voir dire response describing the role of a juror in the death penalty process. Without expressly relying on *Wein*, we reached a similar conclusion in *People v. Riggs* (2008) 44 Cal.4th 248, 325-326, finding it improper for the prosecutor to have posted a chart during penalty phase argument displaying questionnaire comments regarding the purpose of the death penalty that had been written by 12 prospective jurors, some of whom were members of the penalty phase jury.

To preserve a claim of prosecutorial misconduct for appeal, however, the defendant must have raised a timely objection and requested that the jury be admonished to disregard the offending remarks. (*People v. Linton, supra*, 56 Cal.4th at p. 1205; *People v. Huggins* (2006) 38 Cal.4th 175, 251-252.) Defense counsel neither objected to the prosecutor's rhetorical questions, nor asked the court to admonish the jury. Defendant therefore has forfeited his claim of misconduct. (*People v. Thomas* (2012) 54 Cal.4th 908, 944.)

Defendant does not attempt to explain counsel's omission. Nor does he argue that any of the exceptions to the forfeiture rule are applicable here. Rather, he claims that the failure to object and ask for an admonition constituted a violation of his Sixth Amendment right to the effective assistance of counsel that requires reversal of the death sentence.

65

The two-prong standard governing claims of ineffective assistance of counsel is well settled.  " ' "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  [Citations.]" ' "  (*People v. Brown* (2014) 59 Cal.4th 86, 109; see generally *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218; *Strickland v. Washington* (1984) 466 U.S. 668, 688, 693-696.)

This court has recognized that counsel has wide discretion in choosing the means by which to provide constitutionally adequate representation.  (*People v. Ledesma, supra*, 43 Cal.3d at p. 216.)  We also have observed that "[a]n appellate court's ability to determine from the record whether an attorney has provided constitutionally deficient legal representation is in the usual case severely hampered by the absence of an explanation of an attorney's strategy."  (*People v. Weaver* (2001) 26 Cal.4th 876, 955.)  For this reason, we long ago adopted the rule that " '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.  [Citations.]' " (*Ibid*.; see generally *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.) The merits of such claims are more appropriately resolved, not on the basis of the appellate record, but rather by way of a petition for writ of habeas corpus. (*Mendoza Tello*, at pp. 266-267.)

Defendant acknowledges that defense counsel was neither asked to provide, nor offered, an explanation for failing to object to the portion of the prosecutor's closing argument in which he addressed the jurors individually rather than as a

66

group. He asserts, however, that there could be no satisfactory explanation for counsel's omission. Specifically, he observes that an objection and request for admonition would not have raised any issue adverse to the defense case. Rather, he posits, it would have diffused a damaging argument that pandered to the passions and prejudice of the jury.

Defendant's assertion notwithstanding, we cannot say " ' "there simply could be no satisfactory explanation" ' " (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 266) for defense counsel's failure to object. Indeed, one possible tactical reason for the omission appears in the record itself, which indicates that defense counsel expressly referred to the challenged argument during his own closing remarks. Counsel argued to the jurors that by inquiring, "Are you indignant? Are you indignant? Are you indignant?" the prosecutor was asking them to make their penalty decision based on hate. Counsel then explained to the jury that the penalty decision must be based, not on hate, but on weighing the aggravating factors and the mitigating factors. Counsel may have made a deliberate tactical choice not to object to the prosecutor's argument in order to use it to advantage during his own closing statement. Because we cannot confidently conclude based solely on the appellate record whether counsel had a legitimate reason for his omission, however, we do not reach the merits of defendant's claim of constitutionally inadequate assistance. Here, like in most cases, defendant's claim is more appropriately presented by way of a petition for writ of habeas corpus. (See *People v. Snow* (2003) 30 Cal.4th 43, 94-95; *People v. Michaels* (2002) 28 Cal.4th 486, 527.)

### 3. *Cumulative effect of asserted errors*

Defendant argues that the cumulative impact of the asserted errors at the guilt and penalty phases resulted in a fundamentally unfair trial and unreliable

verdicts in violation of his rights under the Eighth and Fourteenth Amendments. Because we have rejected all of defendant's claims of error, there is nothing to cumulate and, in any event, we reject his claim that any asserted cumulative effect warrants reversal.

### 4. Constitutionality of California's death penalty law

Defendant challenges the constitutionality of various features of California's capital sentencing scheme, alone and in combination. He acknowledges that this court has repeatedly rejected such challenges but urges that we reconsider our prior conclusions. We decline his request to do so. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303-304.)

### a. Narrowing function

Section 190.2, which sets forth the special circumstances that render a murderer eligible for the death penalty, including felony murder and lying in wait, adequately narrows the class of death-eligible murderers as required by the Eighth and Fourteenth Amendments. (*People v. Myles* (2012) 53 Cal.4th 1181, 1224-1225; *People v. Frye* (1998) 18 Cal.4th 894, 1028-1029; see also *ante*, pt. II.A.2.) Contrary to defendant's assertion, the electorate did not intend by its adoption of the 1978 death penalty law to make nearly every first degree murder death eligible, nor did it accomplish that result. (*People v. Merriman* (2014) 60 Cal.4th 1, 105; *People v. Jones* (2012) 54 Cal.4th 1, 85.)

### b. Circumstances of the crime as a factor in aggravation

Section 190.3, factor (a), which directs the jury to consider as evidence in aggravation the "circumstances of the crime," has not resulted in the "freakish and wanton" imposition of the death penalty, either by allowing the admission of extensive evidence regarding the impact of the murder on the victim's family members, friends, coworkers, and the community at large, or by permitting

68

prosecutors to argue that the features of the murder, even features squarely at odds with those in other murder cases, are "aggravating" circumstances within the meaning of the statute. (*People v. Merriman, supra*, 60 Cal.4th at pp. 105-106; *People v. Brown* (2004) 33 Cal.4th 382, 401; *People v. Pollack* (2004) 32 Cal.4th 1153, 1180-1183.)

### c. *Penalty phase procedures*

The federal Constitution does not require that the penalty phase jury make unanimous findings beyond a reasonable doubt regarding the existence of particular aggravating factors, or that the aggravating factors outweigh the mitigating factors. (*People v. Linton, supra,* 56 Cal.4th at p. 1215; *People v. Clark* (2011) 52 Cal.4th 856, 1007; see *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [the penalty determination " 'is inherently moral and normative, not factual' " and therefore not susceptible of a burden of proof].) The United States Supreme Court's decisions interpreting the Sixth Amendment's jury trial guarantee (see *Cunningham v. California* (2007) 549 U.S. 270; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not call into question these conclusions. (*People v. Linton, supra*, at p. 1215.)

Similarly, neither the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires that jurors in a capital case be instructed that they may return a verdict of death only if persuaded beyond a reasonable doubt that the aggravating factors exist, that the aggravating factors outweigh the factors in mitigation, and that death is the appropriate penalty. (*People v. Linton, supra*, 56 Cal.4th at pp. 1215-1216.)

"The lack of written or other specific findings by the jury regarding aggravating factors did not deprive defendant of his federal due process and

69

Eighth Amendment rights to meaningful appellate review, violate equal protection of the laws or violate defendant's Sixth Amendment right to trial by jury." (*People v. Linton, supra*, 56 Cal.4th at p. 1216; accord, *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-778.)

Contrary to defendant's assertion, there is no Eighth Amendment requirement that California's death penalty scheme provide for intercase proportionality review, either in the trial court or on review. (*People v. Jones, supra*, 54 Cal.4th at p. 87; *People v. Lang* (1989) 49 Cal.3d 991, 1043; see *Pulley v. Harris* (1984) 465 U.S. 37, 50-52 [no constitutional requirement that state courts conduct intercase proportionality review].)

Permitting the jury to consider prior unadjudicated criminal conduct as a factor in aggravation under section 190.3, factor (b), and imposing no requirement that the jury unanimously find the defendant guilty of the unadjudicated crimes does not violate a defendant's right to due process or his Sixth Amendment jury trial right. (*People v. Clark, supra*, 52 Cal.4th at p. 1007; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1059; *People v. Balderas* (1985) 41 Cal.3d 144, 204-205.)

Use of adjectives such as "extreme" and "substantial" in section 190.3, factors (d) and (g), respectively, does not create a constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 150; *People v. Adcox* (1988) 47 Cal.3d 207, 270.) The trial court was not constitutionally required to instruct the jury that the statutory mitigating factors were relevant solely to mitigation. Nor did the court's instruction directing the jury to consider "whether or not" certain mitigating factors were present invite the jury to use the absence of such factors as an aggravating circumstance, in violation of state law and the Eighth and Fourteenth Amendments. (*People v. Linton, supra*, 56 Cal.4th at p. 1216; *People v. Doolin*

70

(2009) 45 Cal.4th 390, 456; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 123.)

### d.  Procedural safeguards

Contrary to defendant's assertion, the failure to afford capital defendants at the penalty phase some of the procedural safeguards guaranteed to noncapital defendants, such as juror unanimity and written findings, does not violate the equal protection clause.  The two groups of defendants are not similarly situated. (*People v. Whalen* (2013) 56 Cal.4th 1, 91; *People v. McKinnon* (2011) 52 Cal.4th 610, 698; *People v. Watson* (2008) 43 Cal.4th 652, 703-704.)  Nor does California's failure to adopt procedural safeguards utilized by other states in their capital sentencing proceedings deprive California's capital defendants of their rights to due process, equal protection, and a reliable death verdict guaranteed by the Fifth, Eighth, and Fourteenth Amendments.  (*People v. McKinnon, supra*, at p. 698.)

### e.  International law

"Defendant contends that, even assuming that the death penalty itself does not violate international norms of decency, the broad reach of California's capital punishment scheme and use of the death penalty as a regular form of punishment for substantial numbers of crimes are contrary to those international standards and constitute a violation of the Eighth Amendment.  We have addressed and repeatedly rejected the identical argument that California imposes death as ' "regular punishment for substantial numbers of crimes." '  [Citations.] Defendant presents no new arguments that would prompt reconsideration of our prior conclusion." (*People v. Merriman, supra*, 60 Cal.4th at p. 107.)

71

*f. Constitutionality of California's capital sentencing scheme as a whole*

As mentioned above, defendant acknowledges that this court previously has rejected all of the arguments he raises here asserting certain constitutional inadequacies in the death penalty law. He complains, however, that this court's prior conclusions are constitutionally infirm in that they did not take into account the cumulative impact of the asserted defects or consider the functioning of the capital sentencing scheme as a whole. He asks that we reconsider each of his claims "in the context of California's entire death penalty scheme."

This court recently has rejected arguments identical to the one defendant presents. We find no merit to his contention for the reason stated in *People v. Williams* (2013) 58 Cal.4th 197, 296: "We have individually rejected each of defendant's challenges to California's death penalty law, and '[s]uch claims are no more compelling . . . when considered together. . . .' [Citation.]" (Accord, *People v. Debose* (2014) 59 Cal.4th 177, 214; see *People v. Williams* (2008) 43 Cal.4th 584, 648 ["California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments"]; *People v. Gurule, supra,* 28 Cal.4th at pp. 663-664 [same].)

### III. CONCLUSION

We affirm the judgment in its entirety.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**

**CONCURRING OPINION BY CUÉLLAR, J.**

It is well and widely known in legal circles — and codified in the statutes of this state — that only relevant evidence is admissible. (Evid. Code, § 350.) The rationale for the rule is as simple as it is important: Excluding irrelevant evidence furthers the goal of rational, impartial factfinding and decisionmaking by the jury.

Where the defendant's life is at stake, the need for reliability is heightened. (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 340.) Courts must take special care in capital cases to ensure that the evidence offered at the penalty phase is relevant to the question of who should live and who should die. As we have long held, the focus of that individualized inquiry is the defendant's character and the circumstances of the crime for which the defendant is being tried. (*People v. Dyer* (1988) 45 Cal.3d 26, 70; accord, *Woodson v. North Carolina* (1976) 428 U.S. 280, 304 (plur. opn. of Stewart, J.).) Evidence that is not relevant to either of those factors is not relevant to the penalty determination and should be excluded. (*People v. Boyd* (1985) 38 Cal.3d 762, 773-775 (*Boyd*); see generally *People v. Haskett* (1982) 30 Cal.3d 841, 864 ["irrelevant information . . . that diverts the [penalty] jury's attention from its proper role . . . should be curtailed"].)

In distinguishing between what is relevant and what is not, courts must also bear in mind the differing rules governing the admissibility of aggravating and mitigating evidence. Although the jury must be allowed to consider any aspect of a defendant's character or record that may be offered as a basis for leniency, there is no corresponding requirement that it also be allowed to consider every

contention the prosecution might advance as a justification for the death penalty. (*Boyd*, *supra*, 38 Cal.3d at p. 775.) Rather, as the majority acknowledges (maj. opn., *ante*, at p. 54), the evidence in aggravation is limited strictly to those factors enumerated in Penal Code section 190.3. (*Boyd*, at p. 775.)

In this case, the trial court admitted evidence at the penalty phase that was not authorized by Penal Code section 190.3. Nor was it relevant to defendant's character or to the circumstances of the crime for which defendant was being tried. Yet the majority finds no error. I respectfully disagree.

## I.

Defendant murdered Cory Lamons in April 2004. He pleaded guilty to second degree murder in June 2006 and was sentenced to 45 years to life.

Three years later, defendant was charged with the 2002 murder of Scott Miller, which is the subject of this automatic appeal. At the penalty phase of the proceeding, Lamons's mother, Sharon Thompson, was called to testify. Thompson was not a witness to her son's murder, nor did she have any information about the circumstances of her son's death or about the capital crime that led to defendant's conviction in this proceeding. The prosecution called her to the stand instead to talk about how her son's death had affected her life. Thompson's testimony was plainly genuine — and heartfelt: "Well, first thing you do is you can't believe that it really is happening to you. And then it feels like the air is being totally sucked out of the whole room. Then you keep thinking it really isn't happening, that somebody is pulling a joke on you. [¶] Then the rest of your life you keep looking on the street thinking someone has pulled a really horrible joke on you and you are going to see him walking down the street. [¶] His sister helped raise him, and that was really horrible. And then the worst part of it is knowing that they died a violent death. Because you weren't there to protect them. [¶] I miss him every

2

day of my life.  I actually moved out of the state after he died because I just couldn't take it anymore."

Thompson added that her grief never gets any better or any easier.  When remembering her son's birthday a week earlier at her workplace, she broke down and cried.  And when asked how she had changed as a result of her son's murder, Thompson reflected, "I think I am more closed up.  I try not to let anybody get close to me.  I don't want to hurt like that ever again."

## II.

No one disputes that Thompson's testimony would have been admissible at the sentencing hearing following defendant's conviction for her son's murder.  (Pen. Code, § 1191.1.)  Nor is there any doubt that her testimony would have been relevant as victim impact evidence at the penalty phase, had this capital proceeding been based on Lamons's murder.  (Pen. Code, § 190.3, factor (a); see *People v. Cage* (2015) 62 Cal.4th 256, 287-289 [upholding the admissibility of testimony from the victim's mother about the impact of her daughter's death].)  The question here is different:  whether Thompson's testimony concerning her reaction to one murder was relevant to the jury's penalty determination for an unrelated capital murder.  So far as my research reveals, *every other* jurisdiction to have considered the admissibility of this category of evidence has concluded that it is not relevant.  The majority's decision to the contrary mistakenly conflates two distinct categories of evidence:  evidence that tends to show the circumstances of an uncharged crime, and evidence of the uncharged crime's effect on family or friends who were neither victims of nor witnesses to the crime.  Our case law offers ample justification for the admissibility of the first category of evidence.  Thompson's testimony, however, falls in the second category.

3

## A.

California's death penalty statute provides that a defendant's character and record, including the presence or absence of other violent criminal activity by the defendant, is relevant to the penalty determination. (Pen. Code, § 190.3, factor (b) (factor (b)); *People v. Arias* (1996) 13 Cal.4th 92, 193.) As we have previously explained, " '[t]he presence of such activity suggests that the capital offense is the product more of the defendant's basic character than of the accidents of his situation, whereas its absence suggests the opposite.' " (*People v. Ashmus* (1991) 54 Cal.3d 932, 982, quoting *People v. Gallego* (1990) 52 Cal.3d 115, 208-209, fn. 1 (conc. opn. of Mosk, J.).) To aid in the determination of the connection between the charged murder and the defendant's character, factor (b) allows the People to present the jury with not only the fact of the violent criminal activity, but also the "nature and circumstances" of the defendant's violent conduct. (*People v. Benson* (1990) 52 Cal.3d 754, 797 (*Benson*).)

At the penalty phase in *Benson*, *supra*, 52 Cal.3d 754, for example, the People offered testimony from four children whom the defendant had sexually assaulted or threatened to assault. Their heartbreaking testimony included an account of the suffering they had experienced and the emotional scars they continued to carry. (*Id*. at pp. 795-796.) We explained that the children's testimony about the nature and circumstances of the crimes and the prosecutor's related argument were "highly relevant to the life-or-death decision," in that they tended to rebut the defendant's attempt to minimize his culpability and his suggestion that the capital murder victims enjoyed the molestation. (*Id*. at p. 797.)

We drew a distinction, though, between two kinds of evidence: one kind concerning "the effect of such criminal activity on the victims" (the type of evidence presented in *Benson*), and another involving indicia of "the emotional impact of such criminal activity on the victim's family" (as in the case now before

us).  (*Id.* at p. 797 & fn. 9; see also *People v. Karis* (1988) 46 Cal.3d 612, 640, 641 [similarly distinguishing between evidence showing "the impact of the crime on the victim" and evidence of the impact of the crime "on the family of the victim"].)[1]  Evidence of the former kind can be relevant to the penalty determination insofar as it tends to illuminate the nature of the defendant's act, beyond the simple fact that defendant engaged in or was convicted of criminal activity involving the use of force or violence.  (See *People v. Jones* (2012) 54 Cal.4th 1, 24-25, 72-73 [evidence that the stabbing victim, a teacher at the defendant's high school, quit teaching, was institutionalized for a period of time, and remained under psychiatric care 25 years later tended to show the viciousness of the attack and the victim's vulnerability]; *People v. Virgil* (2011) 51 Cal.4th 1210, 1232, 1276 [evidence that the stabbing and robbery victim underwent multiple surgeries and suffered persistent digestive difficulties, facial disfigurement, impaired vision, and sleeping difficulties tended to show the viciousness and extent of the attack]; *People v. Bramit* (2009) 46 Cal.4th 1221, 1228-1229, 1241 [evidence that the victims of armed bank robberies continued to experience fear tended to show the violence of the defendant's conduct]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 10, 39 [evidence that the elderly victim of a stabbing and beating was no longer able to live independently tended to show the viciousness of the attack and the victim's vulnerability]; *People v. Holloway* (2004) 33 Cal.4th 96, 143-144 [evidence that the burglary and assault victim sought psychological treatment and purchased a handgun, which she kept under her pillow, tended to show the brutality of the defendant's conduct]; *People v. Price*

---

[1]     *People v. Edwards* (1991) 54 Cal.3d 787, 835 (*Edwards*), asserted that *Benson* "strongly implies" that both types of evidence were admissible.  But *Edwards*'s dictum was plainly inconsistent with the disclaimer in *Benson* and *Karis* and is entitled to no weight.

(1991) 1 Cal.4th 324, 479 [questions calling for an emotional reaction from two peace officers, who were disarmed and forced into the trunk of their patrol car by the defendant, were not improper because "they could be understood as merely an assessment of the seriousness of defendant's criminal conduct"].)

On the other hand, the grief of those who were neither victims of the crime nor witnesses to it is not relevant evidence of the nature or circumstances of the defendant's violent activity. The majority does not directly address how the reactions of someone who did not witness or experience a crime could be a basis for making inferences about the nature of the crime. Instead, the majority contends that it would be "anomalous" to allow victims of a defendant's nonfatal criminal activity to testify while precluding testimony from the surviving family and friends of a homicide victim. (Maj. opn., *ante*, at p. 60.) But there is no anomaly. *Anyone* — including surviving family and friends — who witnessed the criminal activity that is introduced under factor (b), whether as a victim or as an observer, may testify about the circumstances of that crime. (Cf. *People v. Streeter* (2012) 54 Cal.4th 205, 264 [photographs of torture victim's injuries and tape recording of victim's screams in the ambulance were relevant to show the circumstances of the crime under Pen. Code, § 190.3, factor (a) as well as "the immediate impact of the crime on the victim"].) Such testimony could include evidence of the enduring physical or emotional impact of that crime, to the extent those effects tend to show the nature of a defendant's acts. But factor (b) does not contemplate an inquiry into the emotional state of those who are complete strangers to a crime — indeed, it does not contemplate such an inquiry even if they are tied by kinship or friendship to those who were victims. Such testimony sheds no light on the vulnerability of the victim or the viciousness of the defendant's conduct.

6

**B.**

The majority also analogizes Thompson's testimony about the loss of her son to the victim impact testimony from surviving family and friends of the capital murder victim that the high court authorized in *Payne v. Tennessee* (1991) 501 U.S. 808 (*Payne*), and that we recognized as a legitimate aggravating factor in *Edwards*, *supra*, 54 Cal.3d 787. Yet this analogy is unpersuasive, because it overlooks the legal distinction between information related to an uncharged crime and evidence that concerns the capital murder for which the defendant is on trial.

That distinction exists because the choice between death and life imprisonment without the possibility of parole properly rests on two — and only two — categories of evidence: the defendant's character, and the circumstances of the capital murder itself. (*People v. Dyer*, *supra*, 45 Cal.3d at p. 70.) As part of the latter category of evidence, a jury may consider "the harm caused by the defendant as a result of *the crime charged*" (*Payne*, *supra*, 501 U.S. at p. 819, italics added), "the specific harm caused by *the crime in question*" (*id*. at p. 825, italics added), and "the human cost of the crime *of which the defendant stands convicted*" (*id*. at p. 827, italics added). The purpose of such evidence is to remind the jury that just as the defendant should be considered a "uniquely individual human being[]" (*Woodson v. North Carolina*, *supra*, 428 U.S. at p. 304 (plur. opn. of Stewart, J.)), so too is the victim an individual to his or her family and to society in general. (*Payne*, at p. 825.) To withhold evidence about the capital murder victim would "prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." (*Ibid*.)

But *Payne* did not articulate a rationale for the admission of testimony concerning the emotional reactions of those who, while related to a victim of a defendant's prior forcible or violent criminal conduct, are strangers to the capital crime, and the majority opinion offers none. Just as, in *Price*, it would not have

7

been appropriate to call the spouses of the peace officers who were locked in their patrol car's trunk to testify about the effect of their husbands' ordeal on their own lives, Thompson's feelings about her son's murder were not relevant under factor (b) to the determination of the appropriate penalty for Miller's murder. To be sure, Thompson's feelings were genuine, profound, and indisputably painful and moving. But they shed no light on defendant's conduct in killing her son or on the likelihood that the capital murder of which he was convicted was a product of his character rather than an accident of his situation.

It is not sufficient to assert, as the majority does, that factor (b) evidence encompasses " '*the circumstances* of the prior violent criminal activity.' " (Maj. opn., *ante*, at p. 57.) To be admissible, the particular circumstances sought to be introduced must still be relevant to the jury's task of fixing the penalty. (Evid. Code, §§ 210, 350; see *St. Clair v. Commonwealth* (Ky. 2014) 451 S.W.3d 597, 627, 631 ["evidence of the circumstances of [an uncharged] murder is qualitatively different from evidence of the crime's impact on its victim," the latter having "a complete failure of relevance"].) For purposes of factor (b), such circumstances are relevant only to the extent they tend to illuminate the nature of the defendant's prior violent or forcible act.

The majority's reasoning is also at odds with decisions in a number of our sister jurisdictions. (See *Sherman v. State* (Nev. 1998) 965 P.2d 903, 914 [peace officer's testimony about the effect an uncharged murder had on the victim's community "is not relevant" to an aggravating factor or the circumstances of the charged murder]; *Gilbert v. State* (Okla.Crim.App. 1997) 951 P.2d 98, 117 [testimony from victims' family members about the impact of uncharged murders was irrelevant to the penalty determination]; *State v. Bigbee* (Tenn. 1994) 885 S.W.2d 797, 812 [prosecutor's argument concerning the impact of an uncharged murder on the victim's family was error because the impact was "irrelevant" to the

penalty determination].)  The majority is quite correct that it is not bound by the abundant out-of-state authority rejecting its view, but the analysis in those cases seems more thorough and persuasive to me than what the majority provides.

In *People v. Hope* (Ill. 1998) 702 N.E.2d 1282, for example, the Supreme Court of Illinois overturned a penalty judgment on the ground that a widow was improperly allowed to testify about the loss of her husband.  (*Id*. at pp. 1287-1289.) The court determined that Illinois's victim's rights statute, which resembles our Victim's Bill of Rights (Pen. Code, § 1191.1), did "not contemplate . . . an expansion of victim impact statements to include evidence from victims other than the victims of the offense on trial."  (*Hope*, at p. 1287.)  Nor did the *Hope* court find any other indication that the widow's testimony could be relevant to the jury's penalty determination:  "*Payne* clearly contemplates that victim impact evidence will come only from a survivor of the murder for which the defendant is presently on trial, not from survivors of offenses collateral to the crime for which defendant is being tried."  (*Hope*, at p. 1288.)  Thus, while the details of uncharged crimes can be proper aggravating factors, in that they illuminate the character and record of the capital defendant, the impact of those crimes on the relatives of the actual victims is "simply too attenuated to be relevant."  (*Id*. at p. 1289.)

The Supreme Court of Kentucky reached a similar conclusion in *St. Clair v. Commonwealth*, *supra*, 451 S.W.3d 597, which found error in the admission of a widow's testimony about the impact of an uncharged murder.  The court distinguished the widow's testimony from the circumstances of the uncharged murder itself and concluded that her testimony was "a step too far removed to be relevant to sentencing for the crime being tried."  (*Id*. at p. 626.)  Because the impact of the uncharged murder was "not a circumstance" of the charged crime nor "part of the character of the accused," the admission of her testimony violated the

9

Eighth Amendment and deprived the defendant of due process. (*St. Clair*, at p. 629 & fn. 19.)

And in *Cantu v. State* (Tex.Crim.App. 1997) 939 S.W.2d 627, the criminal court of last resort in Texas found error in the admission of testimony about the impact of an uncharged rape and murder on the victim's mother. The court held that the mother's testimony was not relevant to any matter of consequence in determining the penalty and that *Payne* "does not contemplate admission of such evidence as permissible under the Eighth Amendment." (*Cantu*, at p. 637.)

Indeed, as best I can tell, we are now the only jurisdiction in the country to expand the scope of aggravating evidence in a capital trial to this extent. I recognize that California law allows the family and friends of a murder victim to explain, at the penalty phase of the capital trial, what that loss has meant to them, so as to provide the jury with a full picture of the harm caused by the defendant " 'as a result of the crime charged.' " (*Edwards*, *supra*, 54 Cal.3d at p. 835.) California law also permits the jury to consider the defendant's background and character, which can often be conveyed by the defendant's use of force or violence in other situations. (*People v. Nelson* (2011) 51 Cal.4th 198, 222-223.) To prove the extent of the defendant's force or violence, California law authorizes the jury to consider a range of evidence: not just eyewitness testimony as to the defendant's acts, but also evidence of the victim's suffering — to the extent such evidence tends to illuminate how forceful, how violent, or how vicious the defendant's acts were. (Cf. *People v. Streeter*, *supra*, 54 Cal.4th at p. 264.) But if we heed our duty to " 'strike a careful balance' " in this area (*People v. Murtishaw* (2011) 51 Cal.4th 574, 595), we should also conclude that evidence of the suffering experienced by those who did not witness or experience the defendant's use of force or violence is simply not admissible at the penalty phase of a capital trial. Such evidence is

10

relevant neither to the murder for which the defendant is on trial nor to establish his or her character.

The majority cites two cases in which the trial court nonetheless allowed relatives to testify about the effect an uncharged homicide had on their lives. (Maj. opn., *ante*, at p. 60, citing *People v. Johnson* (2015) 60 Cal.4th 966, and *People v. Adams* (2014) 60 Cal.4th 541.) In neither instance did the defendant challenge the relevance of the testimony, and we thus had no occasion to offer — and did not offer — any justification for its admissibility. (*Johnson*, at p. 993; *Adams*, at p. 573.) The majority likewise fails to support its conclusion that Thompson's testimony was relevant to the choice of penalty. I therefore conclude, as did courts in every other jurisdiction to consider the question, that its admission was error.

I concur in the judgment, though, because I find that the error in the admission of Thompson's testimony was harmless. Her testimony about the impact of the murder on her life was quite brief, about two pages in the reporter's transcript. The jury instructions did not focus the jury's attention on — or even mention — the impact of defendant's uncharged conduct on surviving relatives. Finally, the ultimate impact of Thompson's testimony likely paled in comparison to the voluminous aggravating evidence that defendant had killed three people in separate incidents, had a substantial record of violent conduct in and out of custody, and had attempted to orchestrate violent attacks even while he was in custody awaiting trial. So I find no reasonable possibility that her testimony affected the jury's decision to sentence defendant to death, which, after all, was the verdict defendant himself had requested. (*People v. Enraca* (2012) 53 Cal.4th 735, 765-766.)

**CUÉLLAR, J.**

**WE CONCUR:**

**LIU, J.**
**KRUGER, J.**

11

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Johnson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S178272
**Date Filed:** January 21, 2016

_____

**Court:** Superior
**County:** Orange
**Judge:** Frank F. Fasel

_____

**Counsel:**

Mark D. Lenenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark D. Lenenberg
P.O. Box 940327
Simi Valley, CA  93094-0327
(805) 217-5768

Ronald A. Jakob
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2332